## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | **Chapter 7** |
| | ) | |
| **J. SILVER CLOTHING, INC.,** | ) | **Case No. 05-10522 (PJW)** |
| | ) | |
| Debtor. | ) | |
| _____ | ) | _____ |
| **JEOFFREY L. BURTCH,** | ) | |
| **CHAPTER 7 TRUSTEE,** | ) | |
| | ) | |
| | ) | **Adv. Pro. 07-50814 (KG)** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **CONNECTICUT COMMUNITY BANK, N.A.** | ) | |
| **D/B/A THE GREENWICH BANK & TRUST** | ) | |
| **COMPANY AND JAMES J. FULD,** | ) | |
| **JR.,** | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS JAMES J. FULD, JR. AND CONNECTICUT COMMUNITY BANK, N.A. D/B/A THE GREENWICH BANK & TRUST COMPANY'S OPENING BRIEF IN SUPPORT OF THEIR SECOND MOTION FOR SUMMARY JUDGMENT

**LANDIS RATH & COBB LLP**
Richard S. Cobb (No. 3407)
Rebecca L. Butcher (No. 3816)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile:  (302) 467-4450

*Counsel for Defendants*

Dated:  September 3, 2010

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT .............................................................................................. 1

I. NATURE AND STAGE OF THE PROCEEDING .................................................... 4

II. STATEMENT OF UNDISPUTED MATERIAL FACTS........................................... 5

    J. Silver's Structure and Fuld's Role in the Company......................................... 5

    J. Silver's Capital Raising Efforts ..................................................................... 6

    GBT's Secured and Guaranteed Loan to J. Silver ............................................. 6

    Loan Closing and the Continuous Attempts by GBT's and J. Silver's Counsel to Perfect GBT's Security Interest in J. Silver's Collateral ................................................. 7

    The Pre-Bankruptcy Sale Process and Liquidation of J. Silver's Assets, Including the Justified Payment of GBT's Fully Secured Loan ................................................. 8

    GBT Was Oversecured in J. Silver's Collateral at the Time of the Repayment ............... 10

    J. Silver's Bankruptcy Petition and the Status of the Collateral at the Time of Filing ...... 11

III. SUMMARY OF ARGUMENT ................................................................................. 11

IV. ARGUMENT .............................................................................................................. 13

    A. Summary Judgment Is Appropriate Where There Exist No Material Issues of Fact......... 13

    B. GBT's Perfected Security Interest Was Intended To Be And Was A Substantially Contemporaneous Exchange For New Value.................................................... 15

    C. The Trustee Cannot Sustain Claims Of Fraudulent Transfer Because GBT Was Oversecured On February 16, 2005............................................... 22

    D. GBT Was Oversecured On The Petition Date And The February 16 Repayment Was Not A Preferential Transfer ............................................................ 26

    E. Payment Of A Fully Secured Creditor Cannot Constitute A Breach Of Fiduciary Duty .. 28

    F. There Is No Bad Conduct By Fuld Upon Which To Base An Equitable Subordination Claim............................................................................... 28

G.  Bankruptcy Code Section 502(D) Is Inapplicable Because Fuld And GBT Are Entitled To Summary Judgment On All Of The Trustee's Claims ...................................29

V.  CONCLUSION.................................................................................................................30

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................................................................................14

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)................................................................................................................14

*Computer Personality Sys. v. Aspect Computer (In re Computer Personality Systems)*,
320 B.R. 812 (E.D. Pa. 2005).................................................................................................16

*Creditors' Committee v. Spada (In re Spada)*,
903 F.2d 971 (3d Cir. 1990) ..................................................................................................17

*Dye v. Rivera (In re Marino)*,
193 B.R. 907 (9th Cir. BAP 1996) *aff'd* 117 F.3d 1425 (9th Cir. 1997) ............................20, 21, 22

*Elwell v. PP&L*,
47 Fed. Appx. 183 (3d Cir. 2002)..........................................................................................14

*Erie Marine Enterprises, Inc. v. Nationsbank, N.A. (In re Erie Marine Enterprises)*,
216 B.R. 529 (W.D. Pa. 1998)...............................................................................................24

*First National Trust Ass'n v. American Bank and Trust (In re Adventist Living Centers, Inc.)*,
174 B.R. 505 (Bankr. N.D. Ill. 1994) ....................................................................................24

*Govaert v. Central Bank (In re Calatayud)*,
99 B.R. 106 (Bankr. S.D. Fla. 1989) .....................................................................................24

*In re Erin Food Services, Inc.*,
980 F.2d 792 (1st Cir. 1992)...................................................................................................27

*In re Hechinger Inv. Co. of Delaware, Inc.*,
489 F.3d 568 (3d Cir. 2007) ..................................................................................................19

*In re Jones Truck Lines, Inc.*,
130 F.3d 323 (8th Cir. 1997) ..................................................................................................16

*In re Kroh Brothers Dev. Co.*,
115 B.R. 1011 (Bankr. W.D. Mo. 1990) ................................................................................28

*In re Lyon*,
35 B.R. 759 (Bankr. D. Kan. 1982)........................................................................................22

*In re Martella*,
22 B.R. 649 .............................................................................................................................22

*In re Mobile Steel Co.*
563 F.2d 692 (5th Cir. 1877) ............................................................................28

*Levit v. Ingersoll Rand Fin. Corp. (In re Deprizio),*
874 F.2d 1186 (7th Cir. 1989) ...........................................................................27

*Lindquist v. Dorholt (In re Dorholt, Inc.),*
224 F.3d 871 (8th Cir. 2000) .............................................................................16

*Matsushita Elec. Indus. v. Zenith Radio Corp.,*
475 U.S. 574 (1986).........................................................................................14

*Matter of Prescott,*
805 F.2d 719 (7th Cir. 1986) .............................................................................17

*Peltz v. Hatten,*
279 B.R. 710 (D.Del. 2002)...............................................................................24

*Pine Top Insurance Co. v. Bank of America National Trust and Savings Assoc.,*
969 F.2d 321 (7th Cir. 1992) ..................................................................17, 20, 22

*Rambo v. Chase Manhattan Mortgage Corp.,*
297 B.R. 418 (E.D. Pa. 2003) ...........................................................................26

*Ridgemont Board of Ed. v. N.E.,*
172 F.3d 238 (3d Cir. 1999) ..............................................................................14

*Rocco v. J.P. Morgan Chase Bank,*
2009 U.S. Dist. LEXIS 12850 (W.D. Pa. 2006).................................................26

*Sorenson v. Tire Holdings Ltd. Partnership (In re Vinzant),*
108 B.R. 752 (Bankr. D. Kan. 1989) .................................................................24

## Statutes

11 U.S.C. § 502........................................................................................13, 30

11 U.S.C. § 544....................................................................................12, 22, 26

11 U.S.C. § 547................................................... 11, 13, 15, 16, 22, 26-28

11 U.S.C. § 548.........................................................................12, 13, 22, 24, 28

11 U.S.C. § 550........................................................................................13, 28

6 *Del. C.* § 9-315............................................................................................25

6 *Del. C.* §§ 1304, 1305 .................................................................................................25

6 *Del. C.* §1301(2) ........................................................................................................25

**Rules**

Fed. R. Civ. P. 56(c) ...............................................................................................13, 14

Bankruptcy Rule 7056(c) ...............................................................................................13

James J. Fuld, Jr. ("Fuld") and Connecticut Community Bank, N.A d/b/a The Greenwich Bank & Trust Company ("GBT" and together with Fuld, "Defendants") respectfully submit this brief in support of their second motion ("Second Motion") pursuant to Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 7056-1 of the Local Rules of Practice respectfully requesting that this Court grant them summary judgment and dismiss each and every count of the Trustee's Complaint.

## PRELIMINARY STATEMENT

At the core of this adversary proceeding is an uncomplicated, fully disclosed, typical loan transaction between a bank and a company, guaranteed by the company's majority investor. The attempts by Jeoffrey Burtch, the Chapter 7 Trustee ("Trustee") for the debtor J. Silver Clothing, Inc. ("J. Silver" or "Debtor") to turn this straightforward business deal into a nefarious scheme to strip the Company of assets are without merit or credibility.

In 2003, J. Silver was a company that had survived a prior bankruptcy filing and was seeking to build on the promise of reorganization to make itself into a stronger company. In order to do so it required funds. Some of those funds were raised by purchases of additional debt and equity by current investors. The remaining funds were raised by purchases of debt and equity by new investors including Mr. Fuld. These funds enabled J. Silver to open new stores, expand operations and grow the business. Unfortunately by the late summer of 2004, it was apparent that J. Silver, despite management's best efforts, remained on precarious financial footing. J. Silver needed additional cash to operate through the 2004 holiday season so it could give its new and existing stores an opportunity to flourish. J. Silver sought strategic partners as an additional source of funding throughout 2004, but did not consummate any transactions. With

no viable alternative sources of funds, J. Silver decided to borrow the necessary funds to support the business through the 2004 holiday season.

J. Silver, through Mr. Fuld acting in his capacity as consultant, conferred with numerous banks in order to secure a loan. Ultimately, the only bank offering acceptable terms to J. Silver was GBT. GBT was a bank that had no financial connection to J. Silver and no financial connection to Mr. Fuld prior to the loan transaction. GBT made the loan in accordance with its underwriting policies and standard business practice, requiring a first lien on J. Silver's business assets and a collateral-backed guarantee provided by Mr. Fuld. GBT took affirmative steps to secure its first lien position; including requiring the filing of UCC-3's to clear old liens prior to the loan closing. GBT also required Mr. Fuld to subordinate his notes to GBT's lien and security interest in J. Silver's assets.

When the loan closed there was a delay in filing the UCC-1 reflecting the security interest that J. Silver granted to GBT in J. Silver's assets. GBT's security interest was properly perfected 28 days after the first disbursement of loan proceeds for closing costs and 24 days after the bulk of the loan proceeds were disbursed to J. Silver. The delay was due to errors made by GBT's attorney in filing the UCC-1 in Delaware, that GBT was not aware of until after correction of the error. GBT's attorney acted to correct its mistake without prompting from J. Silver or Mr. Fuld upon learning of the error. When J. Silver's counsel learned of the error, she also acted to correct the deficiency.

J. Silver's new and existing stores did not meet expectations for sales in the 2004 holiday season. By mid-January, J. Silver concluded that another bankruptcy filing was likely. In order to maximize assets, J. Silver proceeded to seek to sell as many of the business assets as possible before filing a petition. In connection with the sale of ten stores to Hoffman Acquisition Corp., a

sale reviewed and approved by J. Silver's board, J. Silver repaid in full GBT's loan to J. Silver. GBT released its lien on J. Silver's assets in conjunction with the repayment, including certain assets being transferred to Hoffman Acquisition Corp.   The release of GBT's lien was a condition of the sale to Hoffman Acquisition Corp.  Without viable prospects for additional asset sales, J. Silver filed its petition for bankruptcy protection a few weeks following the closing of the asset sale to Hoffman Acquisition Corp.

The repayment of GBT's loan is the basis for the majority of the Trustee's claims.  The Trustee's reasoning is as follows: the delay in filing the UCC-1 by GBT's attorney results in the avoidance of GBT's security interest; GBT is an unsecured creditor therefore both Fuld and GBT received unjust benefits from the repayment of GBT's loan to J. Silver.  The Trustee's attempted avoidance of GBT's security interest cannot stand.   The evidence supporting the Trustee's argument was described by this Court as "somewhat circumstantial" in deciding the prior summary judgment motion.  The Trustee's evidence has only deteriorated after proceeding through discovery.  Discovery has now confirmed what was obvious all along: J. Silver and GBT intended the granting of GBT's security interest in J. Silver's collateral to be a contemporaneous exchange for the loan proceeds.

As demonstrated below GBT was and is a properly secured creditor, therefore the Trustee's only remaining avenue to attack J. Silver's repayment of the GBT Loan is if GBT was an undersecured creditor.  GBT was not undersecured at the time of the loan repayment or at the Petition Date.  The Trustee does not have a single sturdy nail on which to hang a claim against GBT, the bank that simply loaned money to a struggling company, or Mr. Fuld, the investor who is being persecuted for his honest attempts to keep J. Silver operating.

The basis for questioning this loan transaction has always been thin.  Given that the

3

subsequent discovery has failed to uncover any facts to support the Trustee's theory of lack of intent, continuation of this action will only increase costs to the estate and diminish the recovery of creditors, including the unjustly accused defendant Fuld who holds claims for a full 40% of the unsecured debt of J. Silver. The estate should be relieved of the burden of this meritless litigation, and summary judgment should be granted in Defendants' favor.

## I.      NATURE AND STAGE OF THE PROCEEDING

A few days shy of the two year statute of limitations for preference and fraudulent conveyance actions, the Trustee commenced this adversary proceeding by filing the Complaint against the Defendants on February 23, 2007. On June 9, 2008, the Defendants each filed their Answers to the Complaint, pursuant to extensions granted by opposing counsel and this Court. On August 5, 2008, Defendants filed their Motion of James J. Fuld, Jr. and Connecticut Bank, N.A. d/b/a Greenwich Bank & Trust Company for Summary Judgment, or in the Alternative Partial Summary Judgment ("First Motion"). The First Motion was briefed by the parties and no oral argument was held. The Court denied summary judgment because the Trustee raised a question of material fact with regard to whether the parties intended a contemporaneous exchange and the value of the collateral in a Chapter 7 liquidation. After an unsuccessful mediation, the parties engaged in discovery with Defendants providing substantial documents and making themselves available for depositions. Neither party identified an expert witness and now discovery has closed. Defendants assert that both factual issues have been resolved in their favor and therefore file their Second Motion of Defendants James J. Fuld, Jr. and Greenwich Bank & Trust Company for Summary Judgment ("Second Motion") contemporaneously with this Opening Brief.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS.

### J. Silver's Structure and Fuld's Role in the Company

J. Silver was a retailer that operated lower priced women's fashion stores.  Declaration of Robert S. Bland dated August 1, 2008 (the "Bland Declaration") ¶ 1.  Fuld had invested in J. Silver initially in 1998 as a minority shareholder.  Deposition Transcript for James J. Fuld, Jr. ("Fuld Transcript") dated April 16, 2010 at p. 5.  J. Silver went through a prior Chapter 11 bankruptcy reorganization beginning in December 2000.  *See* Affidavit of James J. Fuld, Jr. ("Fuld Affidavit") dated July 23, 2010 at ¶ 2.  Fuld's interest was liquidated in connection with that reorganization.  *See id.*  In the fall of 2003, Fuld reinvested in J. Silver through a capital infusion for which he received a majority ownership interest in J. Silver's parent company.  *See* Fuld Transcript at pp. 6-8.  Fuld was the chairman of the board of J. Silver.  *See id.* at pp. 16-17. Fuld did not hold an executive position with J. Silver.  *See* Fuld Affidavit at ¶ 2.

The officers of J. Silver were: Robert Bland who held the position of Chief Executive Officer; John Cerreta who held the position of President; Richard Silver who held the position of Vice President and Executive Merchandising Manager; and, Joseph Bastone who held the position of Chief Financial Officer.  *See* Fuld Transcript at pp. 13-14.  Fuld had no outside business relationships with any of the executives.  *See* Fuld Affidavit at ¶ 6.  Fuld had no responsibility for the day to day operations of J. Silver; the Company was operated by the executives. *See id.* at ¶ 7.

Fuld is the President and owner of a consulting corporation named James J. Fuld Jr. Corporation ("JJF Corp.").  *See* Fuld Transcript at pp. 14-15. JJF Corp was hired by J. Silver to seek additional sources of funding, whether through debt or equity, to expand and improve J. Silver's business. *See id.* at pp. 15, 17, 19-21.

### J. Silver's Capital Raising Efforts

In connection with the efforts to expand and improve its business, J. Silver issued some privately placed notes during 2004. *See id.* at pp. 17-18. Fuld, Neil Goldman, Robert Bland, John Cerreta and Richard Silver all purchased some of these notes. *See id.* at p. 18. Fuld personally invested $1,152,000 in these notes (including his November 2003 purchase), representing a majority of the notes issued. *See* Fuld Affidavit at ¶ 3. Fuld personally invested $1,600,000 in J. Silver and its parent corporation. *See id.* Throughout 2004, the Company was seeking to raise additional funds. *See* Fuld Transcript at pp. 20-21.

During the fall of 2004 when alternate fundraising strategies had failed, including strategic partnerships or venture capital investment, J. Silver needed additional cash to see if newly opened stores and a good holiday season would enable J. Silver to have solid financial footing. *See* Fuld Affidavit at ¶ 4. JJF Corp was asked to seek a loan for J. Silver. *See id.*

### GBT's Secured and Guaranteed Loan to J. Silver

Fuld had discussions with several banks, but the only bank willing to loan money on a timely basis to J. Silver was GBT. *See* Fuld Transcript at pp, 22-23; Fuld Affidavit at ¶ 4. Fuld and GBT met and agreed to basic terms for the loan. *See* Fuld Transcript at pp. 24-25; Deposition Transcript for Richard A. Muskus Jr. dated April 30, 2010 ("Muskus Transcript") at pp. 9-10; Loan Term Sheet attached to Affidavit of Richard A. Muskus, Jr. ("Muskus Affidavit") dated September 2, 2010 as Exhibit 1. The loan was a revolving credit loan in an amount that would not exceed $1 million (the "Loan"). *See* Muskus Affidavit, Ex. 1. GBT's underwriting guidelines require that a lien on a company's assets be taken as security for this type of loan. *See* GBT Underwriting Guidelines for 2004 attached to Muskus Affidavit as Exhibit 2. Therefore, GBT requested a first lien on all of J. Silver's business assets, not including real estate assets.

*See* Muskus Transcript at pp. 14, 21-22.  GBT also requested a guarantee from Fuld.  *See*

Muskus Transcript at 18-19.  Fuld proposed a $500,000 guarantee, but GBT requested a

guarantee of $1 million.  *See* Fuld Affidavit at ¶ 5, Muskus Affidavit at Ex. 1.  Fuld's guarantee

allowed J. Silver to close the loan on a more timely basis, receive a lower interest rate on the

loan and more favorable repayment terms.  *See* Muskus Affidavit at ¶ 3.

The GBT Loan documents required that J. Silver grant GBT a first lien on the following

assets of J. Silver: accounts, as-extracted collateral, chattel paper, deposit accounts, documents,

equipment, farm products, fixtures, general intangibles, inventory, instruments, investment

property, letter of credit rights, other goods, supporting obligations, and the proceeds and

products of all categories, not including any real estate leases (the "Collateral").  *See* Loan

Agreement dated December 1, 2004 attached to Muskus Transcript as Exhibit 4 at §§ 1.7, 3.1.

GBT's lien on the Collateral is a requirement of the terms of the loan.  *See* Muskus Transcript,

Ex. 4 at § 3.1.  In preparation for closing the loan GBT ensured its first lien position by causing

J. Silver to file UCC-3's canceling prior recorded security interests in J. Silver's assets.  *See*

UCC-3's attached to Muskus Affidavit as Exhibit 3.  In addition, to ensure an uncontested first

lien position, GBT required that Fuld subordinate his J. Silver notes to the GBT Loan and lien on

J. Silver's assets.  *See* Subordination Agreement dated December 1, 2004 attached to Muskus

Affidavit as Exhibit 4.

### Loan Closing and the Continuous Attempts by GBT's and J. Silver's Counsel to Perfect GBT's Security Interest in J. Silver's Collateral

The loan closed on December 1, 2004.  *See* Muskus Transcript, Ex. 4.  The first

disbursement on the line of credit to cover closing costs was made on December 2, 2004 in the

amounts of $5,375.00 and $2,545.00.  *See* Loan Disbursement Statement dated December 1,

2004 attached to Muskus Transcript as Exhibit 7. The UCC-1 securing GBT's assets was mailed

to the Delaware Secretary of State on December 3, 2004. *See* Gerard Declaration at ¶ 4, Exhibit 6 to Deposition Transcript for Scott Gerard ("Gerard Transcript") dated April 30, 2010. The third and final disbursement on the loan was made on December 6, 2004 in the amount of $475,000. *See* Bland Declaration at ¶ 3.

The first UCC-1 filing was rejected due to a failure to place the appropriate address in the UCC-1. *See* Gerard Declaration at ¶ 5. Scott Gerard received the rejection, ran a title search to make sure no intervening lien had been placed on the assets and re-filed the UCC-1 on December 20, 2004. *See* Gerard Transcript at pp. 22-24, Gerard Declaration at ¶ 6. As of December 28, 2004, when attorneys for J. Silver asked Gerard for a stamped copy of the UCC-1 it had not been recorded with the Delaware Secretary of State. *See* Gerard Transcript, Ex. 6. J. Silver then filed its own UCC-1 to comply with the terms of the loan on December 30, 2004. *See* UCC-1 attached as Exhibit 2 to Gerard Transcript and Exhibit 9 to Muskus Transcript. That UCC-1 was amended that same day to make sure it the Collateral was listed excluding the leases. *See id.* GBT's corrected UCC-1 was docketed on January 4, 2005. *See id.* GBT was unaware of any delay with the UCC-1 filing or that the initial filing had been rejected by the Delaware Secretary of State. *See* Muskus Affidavit at ¶ 4. After the acceptance of the corrected UCC-1 filed by GBT's attorney on January 4, 2005, GBT learned of the initial rejection. *See id.*

### The Pre-Bankruptcy Sale Process and Liquidation of J. Silver's Assets, Including the Justified Payment of GBT's Fully Secured Loan

The new stores and holiday sales did not achieve the desired result, and in mid-January 2005, J. Silver realized that liquidation and potentially a bankruptcy filing were inevitable. *See* Board Meeting Minutes for January 11, 2005 Board Meeting attached to Fuld Transcript as Exhibit 3. Counsel to J. Silver advised the Company to sell as many assets outside of bankruptcy as possible to maximize asset values. *See id.* The Board resolved at that meeting that J. Silver's

officers would pursue discussions with potential purchasers. *See id.* At this time, J. Silver's counsel informed the Board that there could be a possible conflict of interest between Fuld and J. Silver should the GBT Loan still be outstanding if and when a bankruptcy petition was filed. *See id.* He also reported that GBT may not have filed its lien on a timely basis. *See id.* The Board and counsel to J. Silver concluded that as of January, there was no conflict of interest as both parties had the same interest in maximizing the value of J. Silver's assets. *See id.*

In order to maximize the value of its assets, J. Silver sought to sell as many assets as it could prior to filing for bankruptcy protection. *See* Fuld Transcript at pp. 49-52. Despite approaching numerous buyers, the only firm offer to emerge from the sale process was an offer by Hoffman Acquisition Corp. to purchase 29 of the J.Silver stores for $1.4 million. *See* Fuld Transcript at pp. 49-50. The original Hoffman Sale contemplated that certain stores would be purchased immediately and others would be purchased after filing a pre-packaged bankruptcy petition. See Hoffman APA attached as Exhibit C to Fuld Affidavit. After John Cerreta, president of J. Silver, was unable to secure landlord permission to transfer each of the 29 store leases, the sale was altered. *See* Fuld Transcript at pp. 51-52. Hoffman instead agreed to purchase 10 store leases and related assets for $600,000. *See* Revised Hoffman APA attached to Fuld Transcript as Exhibit 7. As there would no longer be bankruptcy approval that the assets were free and clear of liens and encumbrances, Hoffman now required that GBT's lien on J. Silver's assets be released as part of the sale. *See* Fuld Transcript at pp. 52-53 and Exhibit 7. Additionally, the Loan Agreement required that any outstanding Loan amount be repaid before selling any of the assets that comprised the Collateral. *See* Muskus Transcript, Ex. 4 at § 7.4. The revised sale agreement was approved at a Board Meeting on February 9, 2005. *See* Fuld Transcript at Exhibit 5.

The Revised Hoffman Sale closed on February 16, 2005. *See* Muskus Transcript, Ex. 7.

J. Silver owed GBT $485,569.95 on that date and the Loan was paid off in full on that date (the

"Repayment"). *See id.*

### GBT Was Oversecured in J. Silver's Collateral at the Time of the Repayment

GBT held a security interest in J. Silver's assets as of February 16, 2005, including cash,

inventory, deposits, furniture, fixtures, equipment and other related assets. *See* Muskus

Transcript, Exs. 4, 9. Prior to the Revised Hoffman Sale, GBT had cash of $183,056 ($258,056

less $75,000 for the Hoffman Deposit) in its main operating account, $2,065 in its credit card

account, $4,905 in its small business account and $100,246 in its GBT account. *See* Fuld

Affidavit at Exhibit E. J. Silver therefore *had cash totaling $290,272 on February 16, 2005* after

subtracting the $75,000 Hoffman Deposit. *See id.* GBT had a security interest in all of that cash

because inventory sales in the 20 days prior to February 16 equaled $792,470. *See* Fuld

Affidavit at Exhibit A. Therefore, $290,272 can be designated as proceeds from the sale of

GBT's Collateral. On February 16, 2005, J. Silver owned *inventory worth at least $275,000.*

This inventory value is evidenced by the proceeds from the sale of inventory received in weeks

ending February 19 and February 26 totaling $275,000. *See* Bland Declaration at ¶ 9.

Additional sales occurred post-petition for which Defendants have not received the records.

Additionally, J. Silver had *deposits with lessors worth $38,859.93. See* Fuld Affidavit Exhibit D.

The value of these deposits is shown by the value recovered in lease sales before and after

bankruptcy. See Fuld Affidavit at Exhibit D and Bland Declaration at Exhibit C. The total value

of these three Collateral items was $604,131.93 ($290,272 in cash, $275,000 in inventory,

$38,859.93 in deposits), substantially in excess of the $485,569.95 paid to GBT. *See* Fuld

Affidavit, Exs. A, D and Bland Declaration at ¶ 9. Additionally, GBT had a security interest in

chattel paper, deposit accounts, documents, equipment, furniture, fixtures, general intangibles, instruments, investment property, letter of credit rights, other goods, supporting obligations, and the proceeds and products of these items at the time of the Repayment. *See* Muskus Transcript, Exs. 4, 9.

### J. Silver's Bankruptcy Petition and the Status of the Collateral at the Time of Filing

The proceeds of the Hoffman Sale allowed J. Silver to reduce its debts, but without any further viable offers to purchase assets, J. Silver needed to file its petition for protection under the Bankruptcy Code on February 25, 2005. At the time of the filing, J. Silver had at least $459,381 in cash after paying off the Loan of $485,569.95 on February 16, 2005. *See* Fuld Affidavit at Ex. A. In the 20 days before filing for bankruptcy J. Silver had sold $648,202 of inventory. *See* Fuld Affidavit at Exhibit B and Bland Declaration at ¶ 9. Therefore all of this cash was designated as proceeds. J. Silver also had deposits worth $23,933.34, as evidenced by sale documents. *See* Fuld Affidavit at Exhibit D.

On April 12, 2005, J. Silver's chapter 11 case was converted to a case under chapter 7 of the of title 11 of the United States Code (the "Bankruptcy Code") and Jeoffrey L. Burtch ("Plaintiff" or "Trustee") was appointed as interim trustee. Complaint ¶ 5.

## III.    SUMMARY OF ARGUMENT.

All of the Trustee's claims arise out of the GBT Loan and its Repayment. In analyzing the Trustee's asserted claims, Defendants first address Count 7 of the Complaint which seeks to avoid the security interest granted to GBT by J. Silver in the Collateral under 11 U.S.C. § 547. The Trustee relies on the Loan being an unsecured obligation as, at least partially, the basis for the remainder of his claims. Determination of this claim will affect each of the remaining claims asserted by the Trustee. As detailed in the argument, the granting of the security interest is not an avoidable transfer because the parties intended for the transfer to be a substantially

contemporaneous exchange and at all times acted in accordance with that intent. Therefore, Count 7 of the Complaint should be dismissed.

The Trustee next seeks to attack the February 16 Repayment of the GBT Loan. The Trustee challenges the Repayment both as a preferential transfer and as a fraudulent transfer. The Repayment and release of Fuld's Guarantee are challenged under 11 U.S.C. § 544 and § 548 in Counts 1 and 2 of the Complaint, respectively. These fraudulent transfer counts against Fuld must be dismissed because GBT provided reasonably equivalent value in the release of its valid unavoidable lien on J. Silver's Collateral for which it was indubitably oversecured on February 16, 2005. Fuld faced no exposure on the Guarantee because the Loan was oversecured and therefore received no benefit on account of the payoff of the loan and release of his Guarantee. Counts 1 and 2 should be dismissed with prejudice. In Counts 3 and 8 of the Complaint the Trustee seeks to avoid the Repayment as a preferential transfer to both GBT and Fuld. In order to succeed on his claim that the February 16 Repayment was a preferential transfer to GBT, the Trustee must establish that GBT received more from the February 16 Repayment then it would have received if the *payment had not been made* and the estate had been liquidated under Chapter 7 on the Petition Date. GBT had a valid, unavoidable security interest in the Collateral and was almost fully secured in cash, inventory and deposits on the Petition Date and if the Repayment had not been made would have had an even larger pool of cash securing its obligation. Therefore, GBT did not receive more than it would have in a Chapter 7 liquidation and Count 8 should be dismissed. Further, because GBT had a valid unavoidable security interest in the Collateral and was fully secured on the Petition Date, Fuld did not receive a preferential transfer from the Repayment because he had no liability on the Guarantee. Count 3 should be dismissed.

The Complaint has three counts that depend on the existence of either preferential or fraudulent transfers to the Defendants. The Complaint states two counts, Counts 4 and 9, under 11 U.S.C. § 550 for turnover of avoided or fraudulent transfers. These counts should be dismissed because the Trustee's §§ 547, 548 claims are unsupportable. The Complaint also states a claim for disallowance of claims under 11 U.S.C. §502(d). Section 502(d) disallows the claims of any party who received an avoidable or recoverable transfer under §§ 547, 548 or 550. As the Trustee's claims under those sections must be dismissed so must Count 10 of the Complaint be dismissed.

The Complaints remaining counts, Counts 5 and 6, for equitable subordination and breach of fiduciary duty are wholly dependent on the Repayment being improper. The Repayment was the payment of a senior secured creditor with a valid, unavoidable security interest who was fully secured in J. Silver's Collateral at the time of its Repayment. The Repayment was made in connection with an asset sale in J. Silver's best interest. As established below, the February 16 Repayment is not improper and these remaining counts should be dismissed with prejudice.

The keystone of Trustee's Complaint is that GBT's valid, perfected security interest in the Collateral can be avoided. Remove the keystone, because the parties intended for the perfection of the security interest to be a contemporaneous exchange with the proceeds of the Loan, and the remaining counts of the Complaint collapse. There is no question of fact or law to prevent the dismissal of the Complaint in its entirety.

## IV.    ARGUMENT

### A.    Summary Judgment Is Appropriate Where There Exist No Material Issues Of Fact.

Pursuant to Fed. R. Civ. P. 56(c), incorporated by Bankruptcy Rule 7056(c), summary

judgment should be granted to the moving party if the Court determines that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) (quoting Fed. R. Civ. P. 56(c)). The mere existence of disputed facts will not preclude entry of summary judgment. Rather, only disputes over facts that may affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-8 (1986).

Although a movant has the initial burden of establishing the absence of any genuine issue of material fact, that burden can be satisfied by demonstrating the absence of evidence to support the non-movant's case. *Celotex*, 477 U.S. at 322-23. Once the moving party has met its burden, its opponent must do more than simply show there is some metaphysical doubt as to these material facts. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 599 (1986) (internal quotation omitted). No assertions, bare allegations or speculation will be allowed to defeat summary judgment. *See Ridgemont Board of Ed. v. N.E.*, 172 F.3d 238, 252 (3d Cir. 1999). On a motion for summary judgment, the court must accept all reasonable inferences in favor of the non-moving party, but unreasonable inferences are not considered by the Court. *See Elwell v. PP&L*, 47 Fed. Appx. 183, 187-88 (3d Cir. 2002).

The discovery taken in this case has confirmed that there are no material disputed facts that prevent dismissal of the Complaint. In response to the First Motion, the Court identified two disputed categories of facts for resolution. The first was the valuation of the Collateral and in

considering only the value of the Collateral for which there can be no dispute--cash, security deposits and inventory for which Defendants have actual sales values--GBT was fully secured on the Repayment date and the Petition Date. GBT's fully secured status negates the majority of the Trustee's claims. The second category was facts surrounding the intent of the parties to make a contemporaneous exchange. As set forth below Defendants contend this issue has been resolved in their favor through deposition testimony and documentary evidence that shows the only reasonable inference to be drawn from the facts and circumstances is that the parties intended and did substantially contemporaneously exchange GBT's security interest in the Collateral for new value. Therefore, there are no *material* disputed facts and all *reasonable* inferences to be drawn from those facts dictate that the claims in the Complaint be dismissed in their entirety with prejudice.

### B.    GBT's Perfected Security Interest Was Intended to Be and Was a Substantially Contemporaneous Exchange for New Value

GBT has a validly perfected security interest in J. Silver's Collateral. The Trustee has never challenged whether the security interest is perfected. Rather, the Trustee has attempted to avoid the perfection of GBT's security interest by asserting that the creation of the security interest was a preferential transfer under 11 U.S.C. § 547. GBT's security interest in the Collateral was created on the same day as the Loan closed December 1, but it was not perfected until December 30. Pursuant to § 547(e), the date of the transfer of a security interest for the purposes of determining if such transfer was preferential is the date the security interest was perfected. *See* 11 U.S.C. § 547(e)(2)(B). GBT transferred the funds pursuant to the Loan on December 2, 2004 and December 6, 2004. GBT's security interest in the Collateral was perfected on December 30, 2004. Despite this minor lag in time between the grant of the security interest and perfection, Defendants maintain that GBT's perfected security interest in the

Collateral cannot be avoided because the granting of the security interest was a contemporaneous exchange for new value and therefore, unavoidable.

The purpose behind a trustee's avoidance powers under § 547 is to "discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote equality of distribution to creditors in bankruptcy." *See Lindquist v. Dorholt (In re Dorholt, Inc.)*, 224 F.3d 871, 873 (8th Cir. 2000). Consistent with this purpose the contemporaneous exchange exception provides that when a creditor provides new value with the debtor's contemporaneous transfer of an interest in the debtor's property that will not be considered a preference. *See Computer Personality Sys. v. Aspect Computer (In re Computer Personality Systems)*, 320 B.R. 812, 817 (E.D. Pa. 2005). Specifically, § 547(c)(1) provides:

> (c)    The trustee may not avoid under this section a transfer –
>
>> (1)    to the extent that such transfer was –
>>
>>> (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
>>>
>>> (B) in fact a substantially contemporaneous exchange.

11 U.S.C. § 547(c)(1). This exception supports the general purpose of § 547 because it encourages creditors to continue to work with distressed companies. *See In re Computer Personalities Systems, Inc.*, 320 B.R. at 817; *see also In re Jones Truck Lines, Inc.*, 130 F.3d 323, 326 (8th Cir. 1997) ("Contemporaneous new value exchanges are not preferential because they encourage creditors to deal with troubled debtors and because other creditors are not adversely affected if the debtor's estate receives new value."). This section provides an absolute defense to the Trustee's attempt to avoid GBT's security interest in the Collateral.

The contemporaneous exchange defense is dependent upon whether the parties intended

for the exchange to be contemporaneous.  As the Third Circuit explained "[t]he critical inquiry in determining whether there has been a contemporaneous exchange for new value is whether the parties intended such an exchange." *Creditors' Committee v. Spada (In re Spada)*, 903 F.2d 971, 975 (3d Cir. 1990) (citing *Matter of Prescott*, 805 F.2d 719, 727 (7th Cir. 1986) (additional citations omitted).  A party's stated intentions will be persuasive when their actions support those stated intentions.  *See Pine Top Insurance Co. v. Bank of America National Trust and Savings Assoc.*, 969 F.2d 321, 329 (7th Cir. 1992).  In determining whether an exchange was intended to be and was, in fact, substantially contemporaneous, a court will make a case by case inquiry into the factual circumstances surrounding the transfer, including, for example, the length of delay, reason for delay, nature of transaction, intentions of the parties and possible risk for fraud.  *See id.*

The undisputed material facts demonstrate that the parties to this transaction always intended for GBT's security interest in and lien on the Collateral to be a contemporaneous exchange for the Loan proceeds.  From the initial consultation, GBT indicated that it would require a first lien on the Collateral as a condition to the GBT Loan.  *See* Fuld Affidavit at ¶ 5, Muskus Affidavit at Exhibit 1.  GBT's first lien on the collateral was approved by J. Silver when it agreed to the terms of the Loan.  *See* Muskus Affidavit at Exhibit 1.  From the Loan's inception, J. Silver was aware a requirement of the Loan was a first lien on the Collateral.

GBT similarly understood from the Loan's initial discussion that one condition of the Loan would be a first lien on the Collateral.  This lien requirement is set forth in GBT's underwriting procedures that state "[l]ines of credit are generally extended to companies to finance ongoing working capital needs and are generally secured by a general lien on all business assets."  Muskus Affidavit at Exhibit 2.  Further, the first lien on J. Silver's Collateral was one of

the factors considered by GBT in approving the Loan.  As stated in the commercial loan presentation forwarded to GBT's approval committee "the collateral securing the subject loans are a UCC1 filing on the assets of JSA LLC/J.Silver Clothing Inc.  Primary assets of this business include cash, inventory and FF&E . . . .  Total assets as of 7/31/04 are $3,466,253 with $281,622 in positive shareholder equity." Muskus Affidavit at Exhibit 5, p.2.

The parties' initial intent to grant an immediate security interest was further confirmed in the Loan closing process.  In preparation for the Loan closing GBT required a UCC-3 to be filed to clear an old lien in Connecticut and a certification of no liens in Delaware.  *See* Muskus Affidavit at Ex. 3.  The filing of this UCC-3 allowed GBT to take a first secured lien on the Collateral.  In addition, GBT set forth in the Loan documents the requirement that GBT be granted a first lien on the Collateral; the first lien also is a covenant of the Loan.  *See* Muskus Transcript at Exhibit 4 at §§ 1.7, 3.1.  Absent allowing GBT a first lien in the Collateral, J. Silver would have been in breach of its obligations under the Loan.

Finally, the parties' post-closing actions are consistent with the intent to grant GBT a security interest in and lien on the Collateral in exchange for the Loan proceeds.  GBT's attorney sent the initial UCC-1 to the Delaware Secretary of State for filing on December 3, 2004, only two days after the Loan closing and one day after the first minor Loan disbursement to pay closing fees.  *See* Gerard Declaration at ¶ 4, Gerard Transcript at Exhibit 6.  When J. Silver's attorney inquired about the status of the UCC-1, J. Silver was informed that the UCC-1 had been sent to Delaware on December 3.  *See* Gerard Transcript at Exhibit 6.  The UCC-1 was returned to Gerard's office on or about December 18, 2004 for failure to include the debtor's address.  *See* Gerard Declaration at ¶ 5.  A revised UCC-1 was prepared and sent out within two days on December 20, 2004.  *See* Gerard Declaration at ¶ 6.  When J. Silver's attorney inquired about the

status of the filed UCC-1 on December 29, 2004, the attorney was informed that there had been a problem with the initial filing, but that it had already been corrected *without prompting from J. Silver's counsel*. *See* Gerard Transcript at Exhibit 6.  GBT was not informed by its attorney of the problem with the initial filing.  *See* Muskus Affidavit at ¶ 4.  On December 30, 2004, J. Silver's attorney followed up regarding the UCC-1 filing.  *See* Gerard Transcript at Exhibit 6. Because GBT's attorney had not yet received a stamped copy, J. Silver searched for the filed UCC-1.  *See id*.  There was no UCC-1 on record at that time.  *See id*.  J. Silver proceeded to file a UCC-1 in favor of GBT on December 30 to make sure it was in compliance with its obligations under the Loan.  *See id*.  The mailed UCC-1 from Gerard's office was stamped by the Delaware Secretary of State on January 4, 2005.  *See* Gerard Declaration at Ex. 1.  In the interim, both GBT's closing attorney and J. Silver acted with intent to grant GBT a first lien on the Collateral.

The Trustee has argued that the existence of the Guarantee coupled with the 28 day delay from the initial distribution to perfection negates the parties' intent of a contemporaneous exchange for new value.  Based on the facts and circumstances surrounding the Loan, this is an unreasonable inference.  *See, e.g., In re Hechinger Inv. Co. of Delaware, Inc.*, 489 F.3d 568, 575 (3d Cir. 2007) ("although a delay between the incurrence of the debt and its payment can evidence that the exchange was not intended to be contemporaneous, the passage of time does not necessarily negate intent.").  From the beginning of this transaction the Loan was always intended by the parties to be a secured transaction.  The fact that GBT's attorney during the 2004 holiday season was not as efficient or careful as he probably should have been in recording GBT's security interest in the Collateral, a fact of which GBT was unaware at the time, does not prove that GBT did not intend to take a secured interest in the Collateral at the time the Loan was made.  Further, J. Silver's counsel continued to follow up on the UCC-1 filing after the Loan

closing evidencing J. Silver's intent to grant an immediate lien on the Collateral and remain in compliance with the terms of the Loan.

This Loan is exactly the type of transaction that the contemporaneous exchange exception is designed to protect. The contemporaneous exchange exception is designed to incent creditors to deal with struggling debtors. GBT was a new creditor of J. Silver providing an infusion of fresh capital in the form of a loan to a struggling debtor, and that new capital was provided on the condition of the debtors' grant of a security interest in and lien on its assets. *See, e.g., Pine Top Ins. Co. v. Bank of America Nat'l Trust and Savings Ass'n*, 969 F.2d 321, 328 (7th Cir. 1992); *Dye v. Rivera (In re Marino)*, 193 B.R. 907, 915 (9th Cir. BAP 1996), *aff'd*, 117 F.3d 1425 (9th Cir. 1997). Simply put, the nature of this standard commercial loan transaction supports a finding of contemporaneous exchange.

In analyzing the factual circumstances there are no indicia of fraud related to the securitization of the Loan. The granting of GBT's security interest in the Collateral was always acknowledged by both parties as a condition of the Loan. Further, it is standard business practice for such loans to be collateralized. GBT was not an existing creditor seeking to change its status from unsecured to secured creditor. GBT was a new creditor who all parties always intended to be a secured creditor. Further, GBT unquestionably provided new value--$475,000 in cash--that assisted the business in maximizing its holiday sales. The granting of GBT's security interest as part of this standard commercial Loan was and should be considered a substantially contemporaneous exchange for new value by the Court.

Additionally, the mere existence of the Guarantee in no way negates the parties' intent to grant GBT a security interest in and lien on the Collateral. The question before the Court is not whether GBT intended to take additional security for the Loan or the relative importance of the

two security interests; the only question is whether GBT intended to take and J. Silver intended

to grant a security interest in and lien on the Collateral contemporaneous with GBT's turnover of

new value in the form of the Loan proceeds, and whether that security interest was perfected

substantially contemporaneous with the provision of the Loan proceeds.  At all times, GBT's lien

on the Collateral was a term of the Loan.  The fact that GBT was not willing to rely solely on the

Collateral as security for the Loan in no way proves that it did not intend to take such a security

interest.  GBT intended and did take two forms of security in support of the Loan: a first lien in

the Collateral and $1 million in pledged shares of stock from Fuld held in an Advest account.  In

fact, there was a delay in documentation for both forms of security.  According to an e-mail from

counsel to J. Silver, Kathleen Cunningham, as of December 13, J. Silver was still waiting for

original signature pages from GBT on opening documents for the Advest account that would

hold Fuld's pledged shares that were required for the completion of the account opening.  *See*

Gerard Transcript at Exhibit 7.  It is highly doubtful the Trustee would argue that this delay

negated GBT's intent to take a security interest in Fuld's securities.  Additional security for the

Loan in no way negates or even diminishes the parties' stated intent and consistent actions

supporting that conclusion that GBT's security interest in the Collateral was intended as a

contemporaneous exchange for new value.

Where the delay in perfection has a reasonable and plausible explanation, it does not

defeat intent as part of a contemporaneous exchange defense.  *See In re Marino*, 193 B.R. at 915

("Where there is reasonable and plausible explanation for the delay, there should be no concern

that a creditor was recording a secret lien in anticipation of a bankruptcy.").[1]  The delay in

recording the UCC-1 was the result of a mistake on the part of the closing attorney.  While in a

perfect world this would not have happened, there is nothing in the surrounding circumstances

that indicate the delay negates the parties' stated intent to grant an immediate security interest.

When the parties express intent to grant a security interest, take immediate steps to grant that

security interest and never back away from that intent, the transfer should be considered

substantially contemporaneous.  *See In re Pine Tops*, 969 F.2d at 329 (holding a security interest

perfected three weeks after it was granted and loan proceeds disbursed was a substantially

contemporaneous exchange)..  Delay standing alone is not sufficient to negate intent.  *See In re*

*Marino*, 193 B.R. at 915 (14 days);  *In re Lyon*, 35 B.R. 759, 763 (Bankr. D. Kan. 1982) (20

days); *In re Martella*, 22 B.R. 649 (44 days).

     The only reasonable inference from these factual circumstances is that the parties

intended and, under the flexible standard, did exchange new value in the form of Loan proceeds

substantially contemporaneous with the granting and perfection of GBT's security interest in the

Collateral.   Count 7 of the Complaint, the Trustee's avoidance claim for GBT's perfected

security interest in the Collateral should be dismissed with prejudice.

### C.    The Trustee Cannot Sustain Claims of Fraudulent Transfer Because GBT Was Oversecured On February 16, 2005.

     The Trustee has asserted claims for fraudulent transfer against Fuld arising from the

Repayment under 11 U.S.C. §§ 544 and 548.  The Trustee has asserted that the Repayment was a

fraudulent transfer as to Fuld under Delaware law and under the Bankruptcy Code.  The Trustee

---

[1] Not to mention the fact that if this transfer had taken place after the BAPCA amendments were passed there would be no question that GBT's security interest in the Collateral was not a preferential transfer. The revised statute provides in 11 U.S,C. § 547(e)(2)(B) that all security interests perfected within 30 days of the transfer of the security interest are deemed to have occurred on the date the security interest

has failed to allege circumstances that would constitute actual fraud under § 548 and as GBT had a valid unavoidable lien in the Collateral at the time of the Repayment and was fully secured in the Collateral, the Trustee cannot show that the Repayment was not made for reasonably equivalent value.   Each of the Trustee's fraudulent transfer claims against Fuld should be dismissed.

In order to prove that the Repayment was a fraudulent transfer, the Trustee would need to show that GBT was undersecured at the time of the Repayment.   Based on the undisputed material facts, GBT was fully secured at the time of the Repayment.   The Repayment in the amount of $485,569.95 was made on February 16.   GBT held a security interest in J. Silver's cash, accounts, instruments, inventory, proceeds from the sale of inventory, equipment, furniture, fixtures and deposits.   The value of the Collateral far exceeded the outstanding amount of the Loan at the time of Repayment.   The undisputed value of Collateral held on February 16 includes $290,272 in cash (after subtracting $75,000 for the Hoffman deposit).   *See* Fuld Affidavit at Exhibit E.   GBT had a security interest in all of that cash because inventory sales in the 20 days prior to February 16 equaled $792,470.[2]   *See* Fuld Affidavit at Exhibit A.   On February 16, 2005, J. Silver had inventory worth at least $275,000.   *See* Bland Declaration at ¶ 9.   The value of the inventory is evidenced by the proceeds from the sale of inventory received in weeks ending February 19 and February 26 totaling $275,000.   *See id.*   Additionally, J. Silver had security deposits with landlords worth $38,859.93.   *See* Fuld Affidavit at Exhibit D.   In summary, on February 16, 2005, J. Silver had *at a minimum* $604,131.93 ($290,272 in cash, $275,000 in inventory, and $38,859.93 in deposits) in Collateral for which there can be no dispute about the

_____

was granted.  The Code itself has recognized that that it may take longer than 10 days to perfect a security interest even when the parties intend a contemporaneous exchange.

value.

With just that cash and inventory Collateral, GBT was fully secured on the Loan on the date it was paid.  Further, GBT held a valid security interest in additional Collateral including additional deposits for which Defendants do not have documentation, additional cash in 10 bank accounts for which Defendants do not have statements, all of the furniture, fixtures and equipment from 29 stores, all additional inventory that was not sold prior to the Petition Date, and the warehouse assets.  GBT was not just fully secured at the time of the Repayment, it was *substantially oversecured*.

GBT was fully secured; therefore J. Silver received reasonably equivalent value in return for the Repayment.  *See First National Trust Ass'n v. American Bank and Trust (In re Adventist Living Centers, Inc.)*, 174 B.R. 505 (Bankr. N.D. Ill. 1994) (release of claim provided reasonably equivalent value); *Sorenson v. Tire Holdings Ltd. Partnership (In re Vinzant)*, 108 B.R. 752, 759 (Bankr. D. Kan. 1989) (release of judgment lien provided value); *Govaert v. Central Bank (In re Calatayud)* 99 B.R. 106, 108-09 (Bankr. S.D. Fla. 1989) (release of obligation provided full equivalent value).   Determining reasonably equivalent value is fundamentally a question of common sense.  *See Peltz v. Hatten*, 279 B.R. 710, 736 (D.Del. 2002).  Certainly paying off a fully secured Loan from which the Debtor received cash for the same amount of cash would qualify as a transfer of reasonably equivalent value.  Because J. Silver received reasonably equivalent value for the Repayment the Trustee cannot maintain a claim for constructive fraudulent transfer.  *See* 11 U.S.C. § 548(a)(1)(B).

The Trustee has also failed to provide evidence to support a claim of actual fraud under 11 U.S.C. § 548(a)(1)(A).  All of the Trustee's allegations of actual fraud depend on Fuld and J.

---

[2] A party's security interest in commingled cash proceeds from the sale of collateral in which it has a valid perfected security interest remains perfected without further filing for 20 days after the proceeds are

Silver approving the Repayment for an unsecured loan. But GBT had a valid perfected security interest in the Collateral and was oversecured at the time of Repayment. Therefore, the Trustee has failed to allege material facts to support a claim for actual fraudulent transfer. *See Erie Marine Enterprises, Inc. v. Nationsbank, N.A. (In re Erie Marine Enterprises)*, 216 B.R. 529, 538 (W.D. Pa. 1998) ("It is difficult to perceive how the payments made by the Debtor to [creditor] which was justly owed can be tortured into an act to hinder, delay and defraud creditors."). Moreover, the entire management of J. Silver supported the Hoffman Sale and attendant Repayment to release liens as required by Hoffman. There is a legitimate business reason for the Repayment: to satisfy a fully secured creditor holding a valid perfected security interest in the Company's assets.

The Trustee's failure to provide a basis for actual fraud and GBT's transfer of reasonably equivalent value in exchange for the Repayment in the release of its valid perfected unavoidable and oversecured lien in the Collateral destroys the Trustee's claim for a fraudulent transfer under Delaware law pursuant to § 544. Additionally, the Repayment does not qualify as a transfer of an asset under the Delaware fraudulent transfer statute because property that is encumbered by a valid lien is not an asset of the debtor. *See 6 Del. C.* §1301(2). Under Delaware law, as under bankruptcy law the Trustee cannot demonstrate actual intent or failure to provide reasonably equivalent value, as set forth above, to state a claim under 6 *Del. C.* §§ 1304, 1305.

GBT held a valid perfected lien in J. Silver's Collateral and was substantially oversecured at the time of Repayment. Therefore the Repayment and subsequent release of Fuld's Guarantee was not a fraudulent transfer. Therefore, the Trustee's fraudulent transfer claims are meritless and Counts 1 and 2 of the Complaint should be dismissed with prejudice.

---

received. *See 6 Del. C.* § 9-315.

**D.     GBT was Oversecured on the Petition Date and the February 16 Repayment Was Not A Preferential Transfer.**

The Trustee also seeks to avoid the Repayment as a preferential transfer to both GBT and Fuld.  In order to state a *prima facie* case that the February 16 Repayment to GBT was a preferential transfer, Plaintiff must satisfy all five elements of Bankruptcy Code § 547(b).  Given that GBT was a fully secured creditor holding a valid, perfected and unavoidable security interest in the Collateral, Plaintiff cannot satisfy the fifth *prima facie* element of a preference claim which specifies that to be avoidable as a preference a transfer must enable a creditor:

> to receive more than such creditor would receive if—
>
>> (A) the case were a case under chapter 7 of this title;
>>
>> (B) the transfer had not been made: and
>>
>> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b)(5).  Whether a secured party received more than it would have in a hypothetical Chapter 7 liquidation is determined by assessing the value of the collateral as of the Petition Date.  *See Rambo v. Chase Manhattan Mortgage Corp.*, 297 B.R. 418, 431 (E.D. Pa. 2003).  In order to determine whether a creditor has received more than it would in a hypothetical Chapter 7 liquidation, a court must "undo the transfers in question and construct a hypothetical liquidation as of the petition date."  *Rocco v. J.P. Morgan Chase Bank*, 2009 U.S. Dist. LEXIS 12850, at *17 (W.D. Pa. 2006).

The Trustee has disputed the value of the Collateral as of the Petition Date.  However, now that discovery has been conducted and closed, *strictly on cash and deposits held on the Petition Date, GBT was oversecured.*  At the time of filing its bankruptcy petition, J. Silver had at least $459,381 in cash.  In the 20 days before filing for bankruptcy J. Silver had sold $648,202 of inventory, an asset covered under GBT's security interest.  *See* Fuld Affidavit at Exhibit B,

Bland Declaration at ¶ 9.  Because this cash was proceeds from the sale of Collateral, all of it was proceeds to which GBT's security interest attached.  J. Silver also had deposits worth $23,933.34, as evidenced by sale documents.  *See* Fuld Affidavit at Exhibit D.  In sum, as of the Petition Date, J. Silver had $483,314.34 in cash and cash equivalents.  Simply in cash and deposits, GBT was almost fully secured as of the Petition Date.  Add to this sum the $485,569.95 for the Repayment, since in a Chapter 7 hypothetical liquidation, the transfer must be undone, and J. Silver would have had cash and cash equivalents totaling $971,884.09, *twice* the outstanding Loan amount due, on the Petition Date.  GBT had a valid perfected security interest in no less than $672,135.34 of this amount ($648,202 from sale of Collateral and $23,933.34 in deposits).

In addition, while the liquidation values of the non-cash and cash equivalent assets are disputed, to the $672,135.34 explained above that clearly demonstrates GBT's oversecured position, the Court should add all cash from the 10 bank accounts for which Defendants have not received records, all additional deposits identified in the Bland Declaration, all warehouse assets, all remaining inventory and the value of the furniture, fixtures and equipment for 19 stores.  At bottom, no one can dispute that GBT was oversecured as of the Petition Date.  Therefore, GBT did not receive more by the Repayment than it would have received in a hypothetical Chapter 7 liquidation and, as a result, the preference claims against GBT must be dismissed.

Finally, the Repayment was not a preferential transfer as to Fuld because when a creditor holds collateral sufficient to secure an antecedent debt in full at the time of the transfer, payment of the primary debt produces no cognizable benefit to the guarantor because it has no exposure on the debt at the time of the transfer.  *See Levit v. Ingersoll Rand Fin. Corp. (In re Deprizio)*, 874 F.2d 1186, 1199-2000 (7th Cir. 1989); *see also In re Erin Food Services, Inc.*, 980 F.2d 792,

801 n.15 (1st Cir. 1992); *In re Kroh Brothers Dev. Co.*, 115 B.R. 1011, 1018 (Bankr. W.D. Mo. 1990). Therefore, GBT's oversecured, perfected security interest in the Collateral completely defeats the Trustee's claim for a preferential transfer against both GBT and Fuld. Counts 3 and 8 of the Complaint for preferential transfer should be dismissed with prejudice. Further, as the Trustee has failed to set forth a valid claim under §§ 547 or 548, Counts 4 and 9 for recovery of avoidable or fraudulent transfers under 11 U.S.C. § 550 should also be dismissed.

**E.    Payment Of A Fully Secured Creditor Cannot Constitute A Breach Of Fiduciary Duty.**

Count 5 of the Complaint alleges that Fuld breached a fiduciary duty to creditors by causing the February 16 Repayment to GBT. On February 16, GBT had a fully collateralized security interest in the Collateral not subject to avoidance. GBT was entitled as a matter of law to be paid ahead of other creditors. Neither the company nor its creditors were harmed by the Repayment and, as a matter of law, making that payment cannot have been a breach of fiduciary duty.[3] Consequently, Fuld is entitled to summary judgment on Count 5.

**F.    There Is No Bad Conduct By Fuld Upon Which To Base An Equitable Subordination Claim.**

In Count 6 of the Complaint, Plaintiff alleges that the same set of facts, *i.e.* causing the February 16 Repayment to GBT, constitutes a basis for equitable subordination of Fuld's claims against J. Silver. Fuld is a creditor of J. Silver whose claims are not otherwise in dispute.

In deciding whether a claim should be equitably subordinated, most courts apply the three-prong test set forth in *In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977)*:* (i) the claimant must have engaged in some type of inequitable conduct; (ii) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant; and (iii)

equitable subordination of the claim must not be inconsistent with the provisions of the bankruptcy law.

The alleged misconduct on which the Trustee's entire equitable subordination claim is premised is the February 16 Repayment to GBT.  First, paying a senior secured creditor cannot be characterized as inequitable conduct as the creditor is entitled to payment.  Second, paying a senior secured creditor first cannot be said to harm junior creditors, including Fuld who holds 40% of the unsecured debt, who have no right to be paid until the senior creditor has been paid. Indeed, as explained in the Bland Declaration, the Hoffman Transaction benefited J. Silver's unsecured creditors because the February 16 Payment was necessary to close the Hoffman Transaction and the Hoffman Transaction was beneficial to J. Silver and its creditors in that it maximized the value received by J. Silver for the assets involved in the transaction. Consequently, Fuld is entitled to summary judgment on the Trustee's equitable subordination claim.

### G.   Bankruptcy Code Section 502(D) Is Inapplicable Because Fuld And GBT Are Entitled To Summary Judgment On All Of The Trustee's Claims.

The final Count of the Complaint, Count 10, seeks disallowance of Fuld's and GBT claims under Bankruptcy Code § 502(d) because there are pending avoidance actions against them.[4]  Bankruptcy Code § 502(d) provides:

> Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from property is recoverable under section 542, 543, 550 or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or such transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

---

[3] As explained in the Bland Declaration, the Repayment benefited J. Silver's unsecured creditors because the February 16 Repayment was necessary to close the Hoffman Transaction and the Hoffman Transaction was beneficial to J. Silver and its creditors.

[4] GBT has not asserted a claim because it was paid in full on February 16.

11 U.S.C. § 502(d). Because, Fuld and GBT are entitled to summary judgment on all other Counts in the complaint, Count 10 fails as a matter of law.

## V.    CONCLUSION.

After three years of litigation, all of the documents and testimony produced in discovery (which is now closed) support the Defendants' assertions that the GBT Loan and its subsequent payoff were standard commercial transactions that do not give rise to any actionable claims by the Trustee. The Trustee has failed to produce any documents or testimony to the contrary. Therefore, at this stage the entire Complaint should be dismissed in its entirety and Defendants and the entire creditor body of J. Silver relieved of the costs of its continued prosecution. Resolution of this action would clear the way for conclusion of this case and the distribution of any remaining assets to creditors, including defendant Fuld who holds a full 40% of the unsecured debt. Therefore, Defendants respectfully request that the Court grant them summary judgment in their favor on all counts of the Complaint, and such other and further relief as the Court deems just and appropriate.

Dated: September 3, 2010

**LANDIS RATH & COBB LLP**

Richard S. Cobb (No. 3407)
Rebecca L. Butcher (No. 3816)
919 Market Street, Suite 1800
P.O. Box 2087
Wilmington, Delaware 19899
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

*Counsel for Connecticut Community Bank,*
*N.A d/b/a Greenwich Bank & Trust*
*Company and James J. Fuld, Jr.*

31