# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| **J. SILVER CLOTHING, INC.,** | ) | Case No. 05-10522 (PJW) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| **JEOFFREY L. BURTCH,** | ) | |
| **CHAPTER 7 TRUSTEE,** | ) | |
| | ) | |
| | ) | Adv. Pro. 07-50814 (KG) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **CONNECTICUT COMMUNITY BANK, N.A.** | ) | |
| **D/B/A THE GREENWICH BANK & TRUST** | ) | |
| **COMPANY AND JAMES J. FULD,** | ) | |
| **JR.,** | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS JAMES J. FULD, JR. AND CONNECTICUT COMMUNITY BANK, N.A. D/B/A THE GREENWICH BANK & TRUST COMPANY'S REPLY BRIEF IN SUPPORT OF THEIR SECOND MOTION FOR SUMMARY JUDGMENT AND ANSWERING BRIEF OPPOSING THE TRUSTEE'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**LANDIS RATH & COBB LLP**
Richard S. Cobb (No. 3407)
Rebecca L. Butcher (No. 3816)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile:  (302) 467-4450

*Counsel for Defendants*

Dated:  November 19, 2010

{666.001-W0010515.}

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES...................................................................................ii

PRELIMINARY STATEMENT ........................................................................... 1

CORRECTED FACTS FROM TRUSTEE'S ANSWERING BRIEF ................................3

ARGUMENT.........................................................................................................9

    A.    Section 547(e)(2) Does Not Provide a "Bright-line" Test for Contemporaneity Under Section 547(c)(1) ...............................................................9

        1.    Legal Background: §§ 547(c)(1) and 547(e)(2) .......................................10

        2.    "Bright-line" Rule is Untenable Under a Plain Reading of § 547............11

        3.    The "Bright-line" Theory is Contrary to the Overwhelming Weight of Authority on the Issue ...............................................................13

        4.    This Court Has Implicitly Rejected Plaintiff's Bright-Line Rule..............15

    B.    GBT's Security Interest Was Substantially Contemporaneous and Cannot Be Avoided by the Trustee..........................................................................16

    C.    There is No Genuine Issue of Material Fact as to the Value of the Collateral......21

        1.    The Leases Are Not Included in the Defendants Analysis of GBT's Fully Secured Status at the Time of the Loan Repayment and Petition Date....22

        2.    The Trustee Has Not Raised an Issue of Material Fact Regarding the Value of the Inventory.............................................................................22

    D.    GBT's Security Interest Is Unavoidable and GBT Was Fully Secured in the Collateral, Therefore All of the Trustee's Claims Fail.........................................24

CONCLUSION ..................................................................................................27

i

# TABLE OF AUTHORITIES

**Cases**

*Ames Merch. Corp. v. Revere Mills Inc. (In re Ames Dep't Stores, Inc.),*
2010 Bankr. LEXIS 2991 (Bankr. S.D.N.Y. June 10, 2010) ........................................................14

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242, 249 (1986) ................................................................................................................3

*Chase Manhattan Mortgage Corp. v. Shapiro (In re Lee),*
530 F.3d 458 (6th Cir. 2008) ........................................................................................................11

*Collins v. Greater Atl. Mortg. Corp. (In re Lazarus),*
478 F.3d 12 (1st Cir. 2007)............................................................................................................11

*Gordon v. Novastar Mortg., Inc. (In re Hedrick),*
524 F.3d 1175 (11th Cir. 2008) ........................................................................................11, 12, 13

*HLI Creditor Trust v. Hyundai Motor Co. (In re Hayes Lemmerz Int'l, Inc.),*
329 B.R. 136 (Bankr. D. Del. 2005)..............................................................................................15

*In re Arnett,*
731 F.2d 358 (6th Cir. 1984) ........................................................................................................11

*In re Marino,*
193 B.R. 907 (B.A.P. 9th Cir. 1996), *aff'd,* 117 F.3d 1425 (9th Cir. 1997)............................13, 20

*In re Martella,*
22 B.R. 649 (Bankr. D. Colo. 1982)..............................................................................................20

*Lindquist v. Dorholt (In re Dorholt, Inc.),*
224 F.3d 871 (8th Cir. 2000) ........................................................................................................13

*Morris v. Chisholm Trail State Bank (In re Stephens),*
242 B.R. 508 (D. Kan. 1999)........................................................................................................14

*Moser v. JP Morgan Chase Bank, N.A. (In re Brown),*
375 B.R. 348 (Bankr. E.D. Tex. 2007)..........................................................................................14

*Peters v. Wray State Bank (In re Kerst),*
347 B.R. 418 (Bankr. D. Colo. 2006)............................................................................................14

*Pine Top Ins. Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n,*
969 F.2d 321 (7th Cir. 1992) ........................................................................................................13

*Quiroga v. Hasbro, Inc.*,
934 F.2d 497 (3d Cir. 1991) ................................................................................................3

*Rosenberg v. Rollins, Burdick, Hunter Co. (In re Presidential Airways, Inc.)*,
228 B.R. 594 (Bankr. D. Va. 1999) ......................................................................................14

## Statutes

11 U.S.C. §502(d) ................................................................................................................26

11 U.S.C. § 544 ....................................................................................................................25

11 U.S.C. § 547 ....................................................................................................10, 14, 25, 26

11 U.S.C. § 548 ..............................................................................................................25, 26

11 U.S.C. § 550 ....................................................................................................................26

6 *Del. C.* § 9-315 ................................................................................................................23

## Other Authorities

H.R. Rep. No. 95-595, at 373 (1977), as reprinted in 1978 U.S.C.C.A.N. 5787, 6329 ................13

Defendants James J. Fuld, Jr. and Connecticut Community Bank, N.A d/b/a The Greenwich Bank & Trust Company respectfully submit this reply brief in support of their second motion for summary judgment and answering brief in response to the Trustee's cross-motion for summary judgment and for the reasons set forth in detail below respectfully request that this Court grant Defendants summary judgment and dismiss each and every count of the Trustee's Complaint.

## PRELIMINARY STATEMENT

The Trustee's Answering Brief ("Answering Brief") in response to Defendants' Second Motion[1] demonstrates in stark relief the meritless nature of the claims asserted against Defendants. The Trustee seeks, using inaccurate facts and wholly unsubstantiated speculation, to attempt to create an aura of disreputability surrounding a straightforward loan transaction between J. Silver and GBT that was guaranteed by Fuld. The accurate summary of the transaction is that a financially distressed company sought a loan to support business operations through the 2004 holiday season to see if it could turn around the Company's finances and future prospects. The loan from the first proposal through the execution of the documents was always stated to be based on both a first lien in the Company's assets and a guarantee by a principal of the Company. When perfecting the lien, the bank's outside counsel (or a member of his staff) made some initial errors in filing the UCC statement. Those errors were corrected and the lien was perfected less than 30 days after the loan agreements were executed and the first disbursement made.

After the holiday season, the Company determined its financial turnaround efforts were unsuccessful and that the best course of action to preserve value for all creditors was the

---

[1] This reply brief uses the same defined terms as set forth in Defendants' Opening Brief in Support of its Second Motion for Summary Judgment ("Opening Brief").

{666.001-W0010515.}

liquidation of the Company's assets. A sale of most of the stores was proposed and approved, but not consummated due to issues with certain lease transfers. Thereafter, a sale of those assets which could be transferred was negotiated, reviewed by Board members and consummated. In conjunction with that sale, the buyer required that the bank's perfected security interest in the collateral be released. Therefore, concurrent with the sale, the Company paid back the bank's loan, the collateral was released and certain collateral was sold free and clear to the buyer. Despite an effort to sell the remaining assets, the Company determined the best course of action was to file for bankruptcy protection and did so within a few weeks.

The Trustee's recitation of presumptions and incomplete facts is designed to obscure this very basic and straightforward timeline. However, despite the smoke and mirrors, the Trustee has raised no *genuine material* issue of fact or *reasonable* inference that can be made from the undisputed facts sufficient to sustain the Trustee's claims.

Further, the Trustee's legal argument for negating the bank's security interest has no basis in Third Circuit law. The plain meaning of the Bankruptcy Code does not support the interpretation proposed by the Trustee. Therefore, the Trustee's motion for partial summary judgment should be denied.

Despite this lack of foundation, this matter has stretched out over three years wasting time and estate resources which otherwise would have been available for distribution to creditors, including Fuld, who with approximately 40% of the unsecured claims is J. Silver's largest single creditor. Fuld had devoted time, effort and significant personal assets into attempting to make J. Silver a profitable company and now his limited potential recovery is being used to fund the litigation against him. Any further proceedings in this matter are a waste of the Court's and the parties' resources and will provide no benefit to this limited estate.

Defendants respectfully request that the Trustee's claims be dismissed in their entirety with prejudice.

## CORRECTED FACTS FROM TRUSTEE'S ANSWERING BRIEF

In responding to the Defendants' Second Motion, the Trustee has submitted a statement of "facts" that is riddled with inaccuracies and presumptions that have no foundation in the evidence gathered to date in this matter. This recitation is wholly inappropriate on a motion for summary judgment. In attempting to challenge the Defendants' statement of material undisputed facts (all supported by specific citations to documents, affidavits and deposition testimony), the Trustee may not rely on bare allegations or unsupported assumptions. The non-moving party "may not rest upon mere allegations, general denials, or ... vague statements ...." *Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 500 (3d Cir. 1991). "[T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). The Trustee has failed to allege any material issues of fact under this standard or reasonable inferences from the undisputed facts that would allow the Court to return a verdict for the Trustee.

The first mischaracterization comes on the second page of the Answering Brief's purported Counterstatement of Facts where the Trustee states that "[o]n December 18, 2004, . . ., counsel for GBT, without any evidentiary support presented, allegedly sent another UCC-1 financing statement." Ans. Br. at 5. Defendants provided the deposition testimony of Scott Gerard, a member of the Bar of the State of Connecticut, an affidavit by Scott Gerard and contemporaneous e-mails between Scott Gerard and Kathleen Cunningham as support for this fact. This can hardly be characterized as "without any evidentiary support." As an unsupported and demonstrably false allegation, any inference asserted by the Trustee that such a filing did not occur should be stricken as the Trustee has provided no evidence on which such an inference

3

could reasonably be based.

The Trustee then asserts in his recitation of the perfection process that "counsel to Mr. Fuld, . . . , filed a UCC-1 financing statement" with the Delaware Secretary of State. Ans. Br. at 5. As demonstrated by e-mails attached as exhibits and deposition testimony, the December 30 UCC-1 was filed by Kathleen Cunningham, Esquire of Shack Siegel Katz & Flaherty P.C. ("Shack Siegel"). *See* A376-84. Shack Siegel was counsel to J. Silver, not personal counsel to Fuld. *See* A255 (Fuld Transcript at pp. 39-40) A-354 (Gerard Transcript at p. 9). As the December 30 UCC was unquestionably filed by counsel to J. Silver, any inferences that the Trustee seeks to rely on with regard to the perfection of the security interest by counsel to Fuld as opposed to counsel to J. Silver should be stricken.

The Trustee proceeds to discuss J. Silver's financial condition in early 2005 and the decision of the Board to liquidate assets. In this section, the Trustee makes several unsupported allegations. The first "J. Silver could not pay back from Christmas proceeds the money that had been drawn on the [Loan]." Ans. Br. at 6. The only citation in support is a citation to January 11 Board meeting minutes that discuss an anticipated operating cash shortfall J. Silver could expect to have as a going concern. Nothing in the minutes discusses or even speculates on J. Silver's ability to repay GBT's Loan. In addition to being unsupported, this statement is also inaccurate as Defendants have shown that GBT was fully secured in the Collateral for repayment of the Loan on February 23. This statement and any inferences to be drawn therefrom should not be considered by the Court.

These are the only allegations raised by the Trustee that are germane to the two central issues in the Defendants' Second Motion: 1) Was GBT's security interest in the collateral intended to be and was, in fact, a substantially contemporaneous exchange for new value and 2)

at the time of Loan Payoff and the Petition Date was GBT fully secured in the Collateral. As described above, the Trustee has raised no genuine issue of material fact affecting the determination of the Trustee's Second Motion.

The remaining facts discussed in the Trustee's statement relate to J. Silver's history related to the sale of assets and eventual filing for bankruptcy protection. None of these allegations are relevant to the Court's determination of the Second Motion, but are addressed here to correct the record before the Court.

After speculating on J. Silver's financial condition in early 2005, the Trustee then purports to know what Fuld was thinking at the time, stating "Mr. Fuld became very concerned about his personal guaranty of the loan." Ans. Br. at 6. The Trustee does not even attempt to assert any support for this bald speculation about Fuld's thoughts and motivations. The Trustee's purported facts continue on regarding the January 11 Board meeting by attempting to convey that Fuld's interests were in conflict with J. Silver (Ans. Br. at 7), when the conclusion reached by the Board was, in fact, that "[a]t the current time, both Mr. Fuld and the Company have the same interest in maximizing the value of the Company's assets." *See* A274. Therefore, any inference or insinuation by the Trustee that Fuld was either conflicted with J. Silver or acting out of his "concern" over the personal guaranty should be ignored by the Court. It should be apparent from Fuld's status as J. Silver's largest unsecured shareholder that Fuld and J. Silver had the same interest in maximizing the value of the Company.

The Trustee also mischaracterizes the nature of the original Hoffman deal and the ultimately consummated Hoffman Sale. The original Hoffman transaction contemplated two separate closings one transferring leases from certain landlords willing to grant permission and a second closing post-bankruptcy filing by J. Silver transferring the remaining assets. *See*

5

B000002. As the Trustee is certainly aware, any post-bankruptcy transfer of assets, if approved by the Court, would be a transfer free and clear of all liens and encumbrances. The Hoffman Sale ultimately consummated was completed prior to the initiation of the bankruptcy process and thus the buyer's concerns about release of liens were different. *See* A258-59 (Fuld Transcript at 52-53). Further, as set forth in the minutes, the reduction of stores purchased by Hoffman was due to Hoffman becoming concerned over competing for the remaining stores in the bankruptcy sale process. Therefore, Hoffman elected to only purchase the ten stores for which J. Silver had received landlord consent. *See* A276 (Fuld Transcript at Exhibit 5). The decision by Hoffman to complete the sale outside of the bankruptcy process necessarily precipitated the change in price, assets transferred and requirement for releases.

The Trustee then posits that the Hoffman APA was executed by J. Silver without prior review or approval by the Board. Ans. Br. at 7. This speculation ignores the fact that every Board member participated in the transaction and the closing. Rich Silver was the party who found and negotiated with Hoffman. *See* A258, A265 (Fuld Transcript at 49, 80). John Cerreta negotiated and executed each of the lease transfers associated with the sale. *See* A265 (Fuld Transcript at 80); C16-26 (Hoffman APA Exhibit C). The APA was executed by Bob Bland, the Chief Executive Officer. *See* A265 (Fuld Transcript at 80). In addition, the entire transaction was the subject of a February 9 Board meeting for which minutes have been submitted. *See* A276-77 (Fuld Transcript at Ex. 5). The Trustee cites no support for his speculation, therefore any inferences arising from this assertion, including that the Loan Payoff was not disclosed, should not be considered by the Court in determining the pending Motions.

The Trustee then assumes that Fuld insisted on the payoff of the Loan from the Hoffman sale proceeds despite objection from J. Silver's CFO. *See* Ans. Br. at p. 8. This statement is

inaccurate.    First, the payoff of the Loan was a condition of the Hoffman Sale; Hoffman was

purchasing furniture, fixtures and equipment for ten stores in addition to the lease transfers.  *See*

C1.   In order for Hoffman to receive these Collateral items free and clear of GBT's perfected

security interest, Hoffman needed a release.  *See* C5.  Fuld testified that Hoffman requested the

release of GBT's lien, not Fuld.  *See* A258-59 (Fuld Transcript at pp. 52-53).  The Trustee has

offered no testimony or contemporaneous documents in contradiction of this fact.  Instead the

Trustee has offered a brief e-mail from the firm's CFO, Joe Bastone; written 18 months after the

fact to the Trustee's financial advisor in response to a question by the financial advisor (the

question prompting the timing or the response has not been disclosed).[2]  *See* B000018.  In that e-

mail Bastone, who was not a Board member, is wrong about the amount of money drawn down

on the Loan (he says $1 million, it was $489,000), is wrong that Fuld received a payment on his

notes, is wrong that an investor in J. Silver was Ronald Goldman (it was Neil Goldman), and

then states that Fuld "told us to pay back the loan even though it put us in a tough spot."  *See*

B000018.   With or without the payment on the Loan, J. Silver's course of action had been

determined.  *See* A270-74.  In January, well before any deal with Hoffman was negotiated, J.

Silver's board had already determined that the assets would be liquidated as quickly as possible,

outside of bankruptcy if possible, but if not after filing for bankruptcy protection.  *See* A270-74.

Bastone himself reported at that Board meeting about J. Silver's financial difficulties if it

continued operation and the projected shortfall of over $1,600,000 by the end of June.  *See* A270.

---

[2] The text of Bastone's e-mail is as follows:

> The full million was drawn down after the closing.  I think the Fuld piece was a million also.  I'm not sure.
>
> The bank was fully paid back.  At one point I remember we needed $$ and Jim told us to pay back the bank even though it put us in a tough spot.  As you said he personally guaranteed the loan with his stock portfolio.
>
> If I remember correctly I think a piece of Jim's also got paid back.  He was able to get Bland, Cerreta and a friend of his (I think his name was Ronald Goldman) to invest to keep things going.

The evidence is undisputed that J. Silver was in liquidation mode long before the payoff of the Loan was even discussed. As Bastone's recollection of the basic facts surrounding the Loan is not even correct, his brief, belated characterization of the events leading to the payoff, submitted eighteen months after the fact, should be similarly discredited. The Trustee's attempt to re-cast the Loan Repayment as a sinister scheme by Fuld to advantage himself over the best interests of J. Silver is completely unreasonable in light of the undisputed facts with regard to J. Silver's financial condition, the history of the transaction and Fuld's interest as the largest creditor in enhancing J. Silver's value. Not to mention, the entire inquiry is wholly irrelevant to this Court's analysis regarding contemporaneous exchange and value of the Collateral. Even if there could be a genuine dispute on this issue—it does not have any bearing on the determination of the Second Motion.

The Trustee then proceeds to make allegations regarding the failure of J. Silver to include the Loan Repayment in its initial Schedules and Statements of Financial Affairs (Ans. Br. p. 8-9) and Fuld's purported attempt to control the bankruptcy process (Ans. Br. p. 9). Aside from being blatant speculation and irrelevant to this matter, it is incorrect. Fuld was not involved in the drafting or filing of any bankruptcy pleadings on behalf of J. Silver. *See* A263 (Fuld Transcript at 70-72). Further, the Trustee's empty allegations regarding the BDO report can only be made to falsely cast a bad light on Fuld. If management was desperate to control the bankruptcy process it is counterintuitive that they would seek the appointment of a Chapter 7 Trustee. Further, the BDO report simply lists possible insider transactions and items requiring further investigation, not possible or even probable causes of action. *See* B00005-16. The Trustee after two years of investigations filed only one adversary proceeding in connection with the items listed in the BDO report, this adversary proceeding. The remaining adversaries filed by the

Trustee in this case were all for non-insider preferences. There is no pattern of rampant financial impropriety and no effort on Fuld's part to conceal it.

The Trustee's tactic of asserting inaccurate facts in the hope that the mere appearance of impropriety will distract the Court from the utter lack of evidence to support the Trustee's challenge to the Defendants' Second Motion should be wholly disregarded by this Court. The Trustee has failed to raise any relevant facts that would prevent the Court from granting the Defendants' Second Motion, therefore the Complaint should be dismissed in its entirety.

**ARGUMENT**

The argument addresses both the Trustee's Motion and Defendants' Second Motion. The Trustee's Motion depends solely on the legal argument that 547(e)(2) provides an absolute limit on contemporaneity under 547(c)(1) of ten days. For the reasons set forth below, this legal argument fails. The argument will then address the Trsutee's failure to raise any facts or law challenging Defendants' evidence of both substantial contemporaneity and GBT's fully secured status, which two factors operate to negate all of the Trustee's claims.

A.     **Section 547(e)(2) Does Not Provide a "Bright-line" Test for Contemporaneity Under Section 547(c)(1)**

The Trustee's Motion rests entirely on the mistaken premise that Bankruptcy Code section 547(e)(2) imposes a "bright-line" test for contemporaneity on section 547(c)(1). Because a plain reading of sections 547(c)(1) and 547(e)(2) demonstrates that the "substantially contemporaneous" inquiry is *not* governed by a strict 10-day period, and because the vast majority of courts to have considered the question—including, implicitly, this Court—have renounced the bright-line approach advanced by the Trustee, the Trustee's Motion must be denied.

1.    **Legal Background: §§ 547(c)(1) and 547(e)(2)**

An otherwise preferential transfer that meets the requirements of section 547(b) is not avoidable if the transferee establishes that the transfer was "intended . . . to be a contemporaneous exchange for new value given to the debtor," and was "in fact a substantially contemporaneous exchange."   11 U.S.C.  § 547(c)(1).   For reasons explained more fully in Defendants' Opening Brief the elements of the section 547(c)(1) contemporaneous exchange defense—intentional and factual contemporaneity—are satisfied in this case.

However, the Trustee argues that Defendants' 547(c)(1) defense must fail as a matter of law because the date GBT perfected its security interest in the Collateral was more than 10 days after the Loan and lien against the Collateral were transferred, and therefore the transfer of the lien against the Collateral cannot be viewed to be "substantially contemporaneous" with the transfer of the Loan.   For support, the Trustee relies on section 547(e)(2),[3] which provides that, for the purposes of section 547, a transfer is made "at the time such transfer takes effect" if the transfer is perfected within 10 days of such time, but is made "at the time such transfer is perfected" if the transfer is perfected after 10 days from such time.   Because GBT's security interest in the Collateral was perfected more than 10 days after it took effect, Defendants concede that it was "made" at the time of perfection pursuant to section 547(e)(2).   But determining when the security interest was transferred—in this case, upon perfection—does not decide the question whether that timing was "substantially" contemporaneous with the Loan transfer under section 547(c)(1).   The Trustee's argument that the granting of GBT's security interest in the Collateral cannot have been "substantially contemporaneous" with the making of

---

[3]    Defendants agree with Plaintiff that the pre-BAPCA version of section 547 applies in this case.   Section 547(e)(2) was amended by BAPCA in 2005 to extend the 10 day period provided therein to 30 days.   All citations herein to section 547(e)(2) reference the pre-BAPCPA version.   Note that section 547(c)(1) was not affected by the 2005 BAPCA amendments.

the Loan for the sole reason that it was not perfected within 10 days is wholly without merit because it distorts the statutory text and ignores the overwhelming weight of authority.

### 2.    "Bright-line" Rule is Untenable Under a Plain Reading of § 547

In the Motion, the Trustee argues for a bright-line rule to the effect that any perfection of any security interest after the section 547(e)(2) period causes the transfer of the security interest to be not substantially contemporaneous under section 547(c)(1). For support, the Trustee relies heavily on *Collins v. Greater Atl. Mortg. Corp. (In re Lazarus)*, 478 F.3d 12, 19 (1st Cir. 2007) as well as *In re Arnett*, 731 F.2d 358, 363 (6th Cir. 1984).[4] However, as the Eleventh Circuit has recognized, "The result in those [cases] is a bright-line rule that is drawn at the expense of adherence to the statutory language." *Gordon v. Novastar Mortg., Inc. (In re Hedrick)*, 524 F.3d 1175, 1186 (11th Cir. 2008). In *Hedrick*, the Eleventh Circuit carefully considered and forcefully rejected the arguments and precedents relied on by the Trustee.

First, in considering whether the 10-day period under section 547(e)(2) applied in any way to contemporaneity under section 547(c)(1), the *Hedrick* Court pointed out that the plain text of section 547(c)(1)

> does not set out a bright-line rule and does not refer in any way to the ten-day period contained in § 547(e)(2)(A) or to any other provision's time standard. Congress chose, for whatever reason, not to make ten days the time measure for § 547(c)(1)(B); it chose instead to make "substantially contemporaneous" the standard. We have no license to assume that Congress did not mean what it said in § 547(c)(1)(B), but we are instead bound to assume that it meant exactly what it said. What Congress said in § 547(c)(1)(B) is not "within ten days" but "substantially contemporaneous." The plain meaning of that term conveys flexibility—the opposite of a hard and fast, bright-line rule—and requires a case-by-case approach focused on the facts and circumstances.

---

[4]    As in his response to Defendants' first motion for summary judgment, the Trustee's citation of *Chase Manhattan Mortgage Corp. v. Shapiro (In re Lee)*, 530 F.3d 458 (6th Cir. 2008), is misleading (or mistaken) because that case did not address whether § 547(e)(2) affects contemporaneity under § 547(c)(1). Indeed, the court in *Lee* explicitly recognized that "the defense of contemporaneous exchange for new value [has] not been raised here." *Id.* at 472 n.11.

*Id.* at 1186-87 (citations omitted). In light of Congress's presumably deliberate decision *not to* import a bright-line standard into section 547(c)(1), the *Hedrick* Court cautioned against "revis[ing] statutory provisions in the guise of interpreting them." *Id.* at 1187.

The court next rejected the premise advanced by the First and Sixth Circuits (and repeated by the Trustee) that grafting the 10 day period from section 547(e)(2) onto section 547(c)(1) is necessary to avoid nullifying section 547(e)(2). *See id.* at 1188-89. As the court explained, section 547(e)(2) serves an important and independent purpose aside from the use to which the Trustee would put it, which "has to do with calculating the time of transfers for purposes of the preference provisions contained in other parts of § 547," but instead has the effect of "mov[ing] some transfers that occur within the ninety-day preference avoidance period and would otherwise be avoidable outside of that period." *Id.* The court noted that sections 547(c)(1) and 547(e)(2) plainly "have separate fields of operation," and therefore applying section 547(c)(1) independently of section 547(e)(2) does not risk negating the latter provision. *Id.*

Finally, after noting initially that a resort to legislative history is prohibited where, as here, a statute is plain on its face, the *Hedrick* court observed that "even if we could resort to legislative history in construing the meaning of 'substantially contemporaneous' in section 547(c)(1)(B), it would only reinforce the plain meaning of that term" to the exclusion of a bright-line rule, given that the House Committee Report reads in part as follows:

> The first exception [(§ 547(c)(1))] is for a transfer that was intended by all parties to be a contemporaneous exchange for new value, and was in fact substantially contemporaneous. Normally, a check is a credit transaction. However, for the purposes of this paragraph, a transfer involving a check is considered to be "intended to be contemporaneous," and if the check is presented for payment in the normal course of affairs, which the Uniform

Commercial Code specifies as 30 days, U.C.C. § 3-503 (2)(a), that will
amount to a transfer that is "in fact substantially contemporaneous."

*Id.* at 1190 (quoting H.R. Rep. No. 95-595, at 373 (1977), as reprinted in 1978 U.S.C.C.A.N.

5787, 6329).  The court pointed out that "[u]sing payment of a check 'in the normal course of

affairs' as an example of a 'substantially contemporaneous' exchange is antithetical to the notion

of a bright-line rule specifying a precise number of days." *Id.*  Moreover, Congress's reference

here to a *30-day* period of substantial contemporaneity suggests strongly that it never

contemplated a bright-line rule based upon a 10 day period. *See id.*

### 3.  The "Bright-line" Theory is Contrary to the Overwhelming Weight of Authority on the Issue

Although the Trustee correctly notes that the Third Circuit has not yet ruled on this

question, the vast majority of the Circuit Courts of Appeals to have considered it have

determined that the timing rule under section 547(e)(2) does not decide contemporaneity *per se,*

but instead contemporaneity depends on a variety of factors that must be applied on a case-by-

case basis. *See Hedrick,* 524 F.3d at 1186 (quoted *supra*); *Lindquist v. Dorholt (In re Dorholt,*

*Inc.),* 224 F.3d 871, 874 (8th Cir. 2000) ("we reject the trustee's rigid construction of

substantially contemporaneous and adopt [a] case-by-case approach"); *In re Marino*, 193 B.R.

907, 916 (B.A.P. 9th Cir. 1996), *aff'd*, 117 F.3d 1425 (9th Cir. 1997) ("Instead of applying the

strict ten-day limit enumerated in § 547(e)(2), an inquiry into the facts and circumstances of the

particular transaction should be made to determine whether a transfer was substantially

contemporaneous in fact."); *see also Pine Top Ins. Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n,*

969 F.2d 321, 328-29 (7th Cir. 1992) (applying bankruptcy principles to construe an analogous

provision under Illinois law and holding that "the modifier 'substantial' makes clear that

contemporaneity is a flexible concept which requires a case-by-case inquiry into all relevant circumstances").

In addition to these precedents in the Seventh, Eighth, Ninth, and Eleventh Circuits, lower courts in the Second, Fourth, Fifth, and Tenth Circuits have concluded that a flexible standard, rather than a bright-line test, must be employed to determine whether "substantial contemporaneity" has been shown under section 547(c)(1). *See, e.g., Morris v. Chisholm Trail State Bank (In re Stephens),* 242 B.R. 508, 511 (D. Kan. 1999) ("a delay exceeding [the § 547(e)(2) period] may nevertheless be considered 'substantially contemporaneous' with the value provided to the debtor"); *Ames Merch. Corp. v. Revere Mills Inc. (In re Ames Dep't Stores, Inc.),* 2010 Bankr. LEXIS 2991, at *26 (Bankr. S.D.N.Y. June 10, 2010) ("Rather than providing a bright-line test, 'contemporaneity is a flexible concept.'"); *Moser v. JP Morgan Chase Bank, N.A. (In re Brown),* 375 B.R. 348, 354 (Bankr. E.D. Tex. 2007) ("This Court holds that the grace period set forth in 547(e)(2) constitutes a safe harbor but not an absolute deadline and adopts a case-by-case approach to the determination of whether an exchange was, in fact, substantially contemporaneous."); *Peters v. Wray State Bank (In re Kerst)*, 347 B.R. 418, 426 (Bankr. D. Colo. 2006) ("'Congress' use of the phrase 'substantially contemporaneous' indicates that a flexible standard was intended rather than a specific time limit,'" quoting *Stephens,* 242 B.R. at 511); *Rosenberg v. Rollins, Burdick, Hunter Co. (In re Presidential Airways, Inc.),* 228 B.R. 594, 599 (Bankr. D. Va. 1999) (following the flexible *Pine Top* standard in applying § 547(c)(1)).

The two cases cited by the Trustee pale in comparison to this tidal wave of authority, which holds emphatically that whether contemporaneity is "substantial" under section 547(c)(1) cannot be decided on the basis of an unrelated timing rule but instead must be determined according to case-by-case criteria.    If this Court were to hold otherwise it would directly

14

contravene the well-reasoned judgment of the vast majority of courts to have considered the question.

### 4.    This Court Has Implicitly Rejected Plaintiff's Bright-Line Rule

Although this Court has not explicitly resolved the question, one recent case indicates strongly that the Court has already considered and rejected Plaintiff's bright-line rule. *See HLI Creditor Trust v. Hyundai Motor Co. (In re Hayes Lemmerz Int'l, Inc.),* 329 B.R. 136, 140-41 (Bankr. D. Del. 2005).  In *Hayes Lemmerz*, the plaintiff sought to avoid a payment made by check to a manufacturer-supplier of a machine around the time it delivered a machine to the debtors.   In addressing the defendant's contemporaneous exchange defense under section 547(c)(1), Judge Walrath noted the conflicting authority on the issue of substantial contemporaneity, remarking, "Courts use two approaches to determine whether a transaction is, in fact, substantially contemporaneous.  Some courts follow a strict 10-day rule, adopted from section 547(e)(2).  The majority of courts, however, follow a less rigid approach by examining the totality of circumstances in the case." *Id.* at 140 (citations omitted).   Judge Walrath continued,

> Critical to the Court's analysis under the flexible approach in this case is the time between when the Debtors took possession of the machines and when the check was delivered.  The Defendant failed to provide evidence on these points. Accordingly, the Court lacks the essential ingredients to the contemporaneousness stew.  Without them, the Court cannot grant summary judgment, as the moving party has the initial burden of showing that it is entitled to relief. Thus, the Court will deny the Defendant's Motion for summary judgment.

*Id.* at 140-41.  Although the Court did not expressly endorse the flexible standard, the Court's commentary in *Hayes Lemmerz* reveals clearly that it rejected a bright-line approach.  That is to say, if the bright-line rule were the correct principle of law, the Court's statement that certain evidence was "critical" to its "analysis under the flexible approach" would have been nonsense.

Accordingly, *Hayes Lemmerz* should be read for the proposition that in Delaware, as in almost every other jurisdiction, the Trustee's proposed bright-line rule has been rejected.

Because a plain reading of sections 547(c)(1) and 547(e)(2) demonstrates that the "substantially contemporaneous" inquiry is not governed by a strict 10-day period, and because the vast majority of courts to have considered the question—including, implicitly, this Court—have renounced the bright-line approach advanced by the Trustee, this Court should hold that whether a transfer is "substantially contemporaneous" under section 547(c)(1)(B) is determined by examining the totality of circumstances and not by reference to section 547(e)(2). Accordingly, the Trustee's Motion, which is based only on the theory that a bright-line rule based on section 547(e)(2) should apply in this case, must be denied.  For the reasons set forth below, GBT's security interest in the Collateral was a substantially contemporaneous exchange under the section 547(c)(1) and justifies dismissal of the Complaint.

**B.      GBT's Security Interest Was Substantially Contemporaneous and Cannot Be Avoided by the Trustee**

The Trustee's entire argument seeking to refute that GBT's security interest in the Collateral was perfected contemporaneously with the distribution of the Loan proceeds is based on two facts 1) Fuld guaranteed the Loan with a securities backed Guarantee and 2) there was a 28 day delay in perfection between the initial distribution of closing costs from the Loan proceeds and the filing of the December 30 UCC-1. *See* Ans. Br. at pp.14-15.  Neither of these facts is disputed.  The only dispute between the parties is what reasonable inference can be drawn from these two facts in light of all of the evidence presented to the Court in the Second Motion.

The Trustee would argue that these two facts show both that the Bank never intended to rely on the Collateral for repayment as it had the Guarantee (Ans. Br. at 15) and that GBT was so

negligent in perfecting its interest that it negated its intent for a contemporaneous exchange (Ans. Br. at 14).

The first assumption, that the Bank never intended to rely on its security interest in the Collateral, is unreasonable. From the initial consultation, GBT indicated that it would require a first lien on the Collateral as a condition to the GBT Loan. *See* A66, A221 (Fuld Affidavit at ¶ 5, Muskus Affidavit at Exhibit 1). GBT's first lien on the collateral was approved by J. Silver when it agreed to the terms of the Loan. *See* A220-22 (Muskus Affidavit at Exhibit 1). GBT's underwriting procedures state "[l]ines of credit are generally extended to companies to finance ongoing working capital needs and are generally secured by a general lien on all business assets." A224 (Muskus Affidavit at Exhibit 2). It is GBT's normal course of business to take a security interest in a company's business assets for this type of Loan. The first lien on J. Silver's Collateral was a material factor considered by GBT when deciding whether to approve the Loan: "the collateral securing the subject loans are a UCC1 filing on the assets of JSA LLC/J.Silver Clothing Inc. Primary assets of this business include cash, inventory and FF&E . . . . Total assets as of 7/31/04 are $3,466,253 with $281,622 in positive shareholder equity." A242 (Muskus Affidavit at Exhibit 5, p.2). The parties' intent to grant an immediate security interest was further confirmed in the Loan closing process. GBT required a UCC-3 to be filed to clear an old lien in Connecticut and a certification of no liens in Delaware. *See* A229-33 (Muskus Affidavit at Ex. 3). The filing of this UCC-3 allowed GBT to take a first secured lien on the Collateral. In addition, GBT set forth in the Loan documents the requirement that GBT be granted a first lien on the Collateral; the first lien also is a covenant of the Loan. *See* A304-05, A308 (Muskus Transcript at Exhibit 4 at §§ 1.7, 3.1). Absent allowing GBT a first lien in the Collateral, J. Silver would have been in breach of its obligations under the Loan. The initial

17

UCC was filed on December 3, two days after the Loan closed and one day after the initial

disbursement for costs. While there was an error in the initial UCC-1, GBT's counsel acted with

intent to perfect GBT's security interest immediately following the Loan closing.

Given all of this evidence of intent between the parties, the Trustee's argument that the

existence of the Guarantee is sufficient to negate the parties' intent to grant a security interest in

the Collateral contemporaneous with the Loan is unreasonable. Further if the Trustee attempts to

argue that the existence of the Guarantee coupled with the delay in perfection negates intent, then

by the Trustee's reasoning, GBT must not have intended for the Loan to be secured at all. As of

December 13, eleven days after the Loan closed, GBT's counsel had not provided all of the

signed documents necessary to open the Advest account securing GBT's interest in Mr. Fuld's

securities. *See* A380 (Gerard Transcript at Exhibit 7). A court cannot reasonably infer based on

all of the evidence set forth in the documents and deposition testimony that GBT did not intend

to take a contemporaneous security interest in the Collateral at the time the Loan closed. GBT

did intend to take such and interest and J. Silver intended to grant that interest.

The Trustee's remaining argument on Defendants' 547(c)(1) defense is that GBT and its

counsel was so negligent or dilatory in perfecting its security interest in the Collateral that the

perfection was not substantially contemporaneous. Ans. Br. at pp. 14-15. The undisputed

sequence of events is that GBT's attorney sent the initial UCC-1 to the Delaware Secretary of

State for filing on December 3, 2004, only two days after the Loan closing and one day after the

first minor Loan disbursement to pay closing fees. *See* A59, A373, A377 (Gerard Declaration at

¶ 4, Gerard Transcript at Exhibits 6, 7). When J. Silver's attorney inquired about the status of the

UCC-1, J. Silver was informed that the UCC-1 had been sent to Delaware on December 3. *See*

A373 (Gerard Transcript at Exhibit 6). The UCC-1 was returned to Gerard's office on or about

December 18, 2004 for failure to include the debtor's address. *See* A59 (Gerard Declaration at ¶ 5). A revised UCC-1 was prepared and sent out within two days on December 20, 2004. *See* A59 (Gerard Declaration at ¶ 6). When J. Silver's attorney inquired about the status of the filed UCC-1 on December 29, 2004, the attorney was informed that there had been a problem with the initial filing, but that it had already been corrected *without prompting from J. Silver's counsel. See* A373-74 (Gerard Transcript at Exhibit 6). GBT was not informed by its attorney of the problem with the initial filing. *See* A217-18 (Muskus Affidavit at ¶ 4). On December 30, 2004, J. Silver's attorney followed up regarding the UCC-1 filing. *See* A374 (Gerard Transcript at Exhibit 6). Because GBT's attorney had not yet received a stamped copy, J. Silver searched for the filed UCC-1. *See id.* There was no UCC-1 on record at that time. *See id.* J. Silver proceeded to file a UCC-1 in favor of GBT on December 30 to make sure it was in compliance with its obligations under the Loan. *See id.* The mailed UCC-1 from Gerard's office was stamped by the Delaware Secretary of State on January 4, 2005. *See* A61 (Gerard Declaration at Ex. 1).

Without citation to any authority (other than a case relying on the ten day "bright line" standard), the Trustee assumes that the above recitation of facts makes GBT, through its counsel, so dilatory or negligent as to negate intent. No party disputes that the perfection of GBT's security interest could have gone smoother and faster. But the question before the Court is not whether it could have been done better, but whether the actions taken to perfect the security interest were so dilatory or negligent as to negate substantial contemporaneity. Defendants submit that the history of the perfection of GBT's interest clearly does not satisfy these criteria.

GBT hired counsel to assist with the closing of the Loan. That counsel made some errors in perfecting GBT's lien. GBT was not informed of those errors until after they had been

19

corrected. *See* A217-18 (Muskus Affidavit at ¶ 4). Much like in the *In re Marino* case, GBT did not take actions causing a delay but a vendor hired by GBT failed to take appropriate action. *See Dye v. Rivera (In re Marino)*, 193 B.R. 907 (B.A.P. 9th Cir. 1996), *aff'd,* 117 F.3d 1425 (9th Cir. 1997). In the *In re Marino* case the lender's title company failed to record its lien on certain real estate until 14 days after the granting of the lien. *See id.* at 916.

Even if the delay by GBT's attorney is a series of actions attributable to GBT (which the Trustee asserts without any authority whatsoever), those actions were not so dilatory or negligent as to prevent substantial contemporaneity. The initial UCC-1 was filed two days after closing, with one small error of leaving off an address. Once returned, the UCC-1 was replaced within two days with a corrected form without prompting from outside sources. While there was some delay between the December 20 mailing and the January 4 recordation, which likely can be attributed to the several days of legal holidays, increased mail volume and decreased staff at the Secretary of State due to the Christmas and New Year's holidays, GBT's counsel acted consistently with the intent to perfect GBT's security interest in the Collateral. In the case of *In re Martella,* 22 B.R. 649 (Bankr. D. Colo. 1982), a lender's error in sending paperwork to the wrong county that resulted in a 47 day delay in perfection was not so negligent as to defeat substantial contemporaneity. *See id.* at 653. GBT's lien in the Collateral was perfected within 30 days. Under the current Bankruptcy Code section 547(e)(2), GBT's perfection would have been deemed to occur on December 1, the same day the security interest was granted, thus making it, in fact, substantially contemporaneous.

There is no genuine issue of material fact with regard to intent. The Court cannot reasonably infer from the totality of the evidence before it that the existence of the Guarantee and the delay in perfection of GBT's security interest in the Collateral would negate the parties'

intent to make a contemporaneous exchange under 547(c)(1). After reviewing documents, conducting depositions and faced with the Defendants' overwhelming evidence of intent, these two facts could not support a verdict for the Trustee that GBT and J. Silver did not intend the granting of the security interest to be a contemporaneous exchange for new value. Further, the timeline of the perfection of GBT's security interest in the Collateral does not support a finding that GBT was so dilatory or negligent as to prevent a finding of substantial contemporaneity under section 547 (c)(2). As discussed above and in the Opening Brief, the only reasonablke inference to be drawn from the totality of the circumstances is that GBT's security interest was, in fact, substantially contemporaneous with the Loan. The Trustee's claim to avoid GBT's security interest should be dismissed in its entirety.

C.    **There is No Genuine Issue of Material Fact as to the Value of the Collateral**

Defendants have set forth a complete description of the value of certain Collateral both at the time of the Loan Repayment and the Petition Date. *See* Op. Br. at pp 10-11, 23-24, 27-28. The only Collateral relied on by Defendants in showing that GBT was fully secured at these two times is cash proceeds from the sale of inventory, inventory and deposits. *See id.* In response, the Trustee has attempted to challenge the value of the Collateral by questioning the value of the leases and GBT's lack of a control agreement, both of which are wholly irrelevant to a determination of the Collateral's value. Further, with absolutely no factual support, the Trustee has asserted that the inventory is overvalued. The Trustee has not questioned or challenged the data provided by Defendants with regard to bank account balances, inventory sales or deposits. None of these questions raise a genuine issue of material fact as to the value of the Collateral set forth as fully securing GBT's Loan, therefore summary judgment should be granted in Defendants' favor.

21

1.  **The Leases Are Not Included in the Defendants Analysis of GBT's Fully Secured Status at the Time of the Loan Repayment and Petition Date**

The Trustee's attempt to raise an issue regarding whether GBT was fully secured in the Collateral by challenging the value of the leases transferred as part of the Hoffman Sale is a red herring.  Defendants did not rely on the value of the leases in demonstrating that GBT was fully secured in the Collateral. In fact, Defendants' analysis specifically excluded proceeds from the Hoffman Sale in determining the value of the Collateral. *See* Fuld Affidavit at Ex. E.  GBT was fully secured in the Collateral even when the only Collateral considered was proceeds from the sale of inventory, inventory and security deposits. *See* Op. Br. at pp 10-11, 23-24, 27-28.  The fact that the Defendants have not attributed a value to the leases has no effect on the evidence presented by Defendants in support of GBT's fully secured status. *See* Fuld Affidavit at Ex. E. Defendants purposely relied only on Collateral about whose value there could be no dispute.

2.  **The Trustee Has Not Raised an Issue of Material Fact Regarding the Value of the Inventory**

Defendants have presented as evidence of the value of inventory held by J. Silver on February 16, the actual sales of inventory made by J. Silver in the weeks ending February 19 and February 26. *See* A5 (Bland Declaration at ¶ 9).  In support of these sales figures, Defendants have provided J. Silver's internal sales records, bank statements and verification of the same by J. Silver personnel. *See* A56-59, A68-77, A86-216 (Bland Declaration at Exhibit 6, Fuld Affidavit at Exhibits A, B, D. E).  These actual sales total $275,000.  These sales were made in the weeks immediately following the Loan Repayment and accurately show the value of the inventory as that is the actual net proceeds to J. Silver from the sale of the inventory.  None of these documents or figures have been challenged by the Trustee.

In response the Trustee states that he disputes the value of the inventory because in

describing the terms of the initial Hoffman deal, Mr. Silver indicated that J. Silver "could leave

any unsold inventory in the stores and that [Hoffman] would either sell such inventory or dispose

of it." B000003.  The fact that the inventory was potentially going to be a part of the $1.4

million proposed sale to Hoffman indicates absolutely nothing about the value to be attributed to

the inventory.  The Defendants have provided actual sales figures for the inventory, the inclusion

of the inventory in the initial Hoffman sale in no way contradicts or even questions the value of

this inventory.  Again, the Trustee has failed to raise a genuine material issue of fact regarding

the undisputed value of the Collateral that supports a determination that GBT was fully secured.

The Trustee has offered no evidence on which a Court could reasonably infer that the value of

the collateral was less than its sale price.

### 3. GBT Had a Perfected Security Interest in the Proceeds from the Sale of Collateral

The Trustee's final challenge to the undisputed value of certain Collateral cited by

Defendants as evidence that GBT was demonstrably oversecured is to claim that GBT had no

perfected security interest in any cash held by J. Silver in Bank of America because it did not

have a control agreement with Bank of America.  This argument misunderstands both what cash

Defendants assert was subject to GBT's security interest and the basis for the perfected security

interest.

GBT had a valid perfected security interest in J. Silver's inventory.  GBT had a valid

perfected security interest in all proceeds from the sale of inventory in the 20 days prior to the

determination of GBT's security.  *See* 6 *Del. C.* § 9-315.  Defendants have attached to their

Opening Brief J. Silver's bank account statements showing the cash contained in J. Silver's

accounts on the date of the Loan Repayment and the Petition Date.  *See* A91-216 (Fuld Affidavit

at Exhibit E).  Defendants have also attached to their Opening Brief the records of inventory

sales for the 20 days prior to the date of the Loan Repayment and the 20 days prior to the Petition Date. *See* A68-77 (Fuld Affidavit at Exhibits A, B). In demonstrating that GBT was fully secured on the date of the Loan Repayment and the Petition Date, Defendants have only relied on the cash that is attributable to inventory sale proceeds within 20 days of the two operative dates. The Trustee's argument regarding control agreements has absolutely no effect on Defendants' assertion. GBT was fully secured in these inventory sale proceeds. The Trustee has not raised a genuine issue of material fact.

Defendants have set forth that GBT was fully secured in the Collateral as of the date of the Loan Repayment and the Petition Date even when only the Collateral with an undisputed value is considered. The subject Collateral is limited to inventory, security deposits and cash proceeds from the sale of inventory occurring within 20 days prior to the Loan Repayment or Petition Date. In response the Trustee has raised an issue as to collateral not included in this analysis, the leases, a question about the value of inventory without any supporting facts and a legal opposition to including cash even though Defendants specifically stated they are only relying on cash proceeds from the sale of inventory. The Trustee has not raised any genuine issues of fact or law to challenge GBT's fully secured status as of both the Loan Repayment date and the Petition Date. Therefore, the Trustee's claims should be dismissed.

**D.    GBT's Security Interest Is Unavoidable and GBT Was Fully Secured in the Collateral, Therefore All of the Trustee's Claims Fail.**

The Trustee seeks to assert that all of its claims survive because GBT's security interest in the Collateral is avoidable. *See* Ans. Br. at pp. 18 (preference), 19 (equitable subordination), 21-23 (the remaining counts of the Complaint). However, as set forth in sections A and B of the Argument above, GBT's security interest in the Collateral cannot be avoided. Because GBT had a valid perfected security interest in the Collateral at the time of the Loan Repayment and

because GBT was fully secured in the Collateral at the date of the Loan Repayment and the Petition Date, each of the Trustee's claims fail.   For a more fulsome description of the deficiencies in the Trustee's claims, *see* Opening Brief at pp. 15-30.   These deficiencies are summarized below as a reminder that by failing to assert a genuine material issue of fact or law justifying the avoidance of GBT's security interest or that GBT was not fully secured in the Collateral, the Trustee has failed to raise a material issue of fact or law to sustain the Complaint.

Count 7 of the Complaint which seeks to avoid the security interest granted to GBT by J. Silver in the Collateral under 11 U.S.C. § 547. This security interest is unavoidable. Therefore, Count 7 of the Complaint should be dismissed.

The Trustee challenges the Loan Repayment both as a preferential transfer and as a fraudulent transfer.   The Repayment and release of Fuld's Guarantee are challenged under 11 U.S.C. § 544 and § 548 in Counts 1 and 2 of the Complaint, respectively.   These fraudulent transfer counts against Fuld must be dismissed because GBT provided reasonably equivalent value in the release of its valid unavoidable lien on J. Silver's Collateral for which it was indubitably fully secured on February 16, 2005.   Fuld faced no exposure on the Guarantee because the Loan was oversecured and therefore received no benefit on account of the payoff of the loan and release of his Guarantee.   Counts 1 and 2 should be dismissed with prejudice.   In Counts 3 and 8 of the Complaint the Trustee seeks to avoid the Loan Repayment as a preferential transfer to both GBT and Fuld.    In order to succeed on his claim that the February 16 Repayment was a preferential transfer to GBT, the Trustee must establish that GBT received more from the February 16 Repayment then it would have received if the *payment had not been made* and the estate had been liquidated under Chapter 7 on the Petition Date.   GBT had a valid, unavoidable security interest in the Collateral and was almost fully secured in cash, inventory

and deposits on the Petition Date and if the Repayment had not been made would have had an even larger pool of cash securing its obligation. Therefore, GBT did not receive more than it would have in a Chapter 7 liquidation and Count 8 should be dismissed. Further, because GBT had a valid unavoidable security interest in the Collateral and was fully secured on the Petition Date, Fuld did not receive a preferential transfer from the Loan Repayment because he had no liability on the Guarantee. Count 3 should be dismissed.

The Complaint has three counts that depend on the existence of either preferential or fraudulent transfers to the Defendants. The Complaint states two counts, Counts 4 and 9, under 11 U.S.C. § 550 for turnover of avoided or fraudulent transfers. These counts should be dismissed because the Trustee's §§ 547, 548 claims are unsupportable. The Complaint also states a claim for disallowance of claims under 11 U.S.C. §502(d). Section 502(d) disallows the claims of any party who received an avoidable or recoverable transfer under §§ 547, 548 or 550. As the Trustee's claims under those sections must be dismissed so must Count 10 of the Complaint be dismissed.

The Complaints remaining counts, Counts 5 and 6, for equitable subordination and breach of fiduciary duty are wholly dependent on the Loan Repayment being improper. The Repayment was the payment of a senior secured creditor with a valid, unavoidable security interest who was fully secured in J. Silver's Collateral at the time of its Repayment. The Repayment was made in connection with an asset sale in J. Silver's best interest. The February 16 Repayment is not improper and these remaining counts should be dismissed with prejudice.

The crux of the Trustee's Complaint is that GBT's valid, perfected security interest in the Collateral can be avoided. It cannot be avoided. GBT was fully secured in the Collateral at all relevant times. The Trustee has failed to raise a genuine material question of fact or law as to

26

these two points, therefore all of the claims in the Complaint fail.  The entire Complaint should be dismissed with prejudice.

## CONCLUSION

Despite ample opportunity for discovery, production of thousands of documents by Defendants and depositions, the Trustee has failed to set forth sufficient evidence on which a Court might enter a verdict in its favor.  The Trustee has raised no genuine disputed facts or reasonable inferences to support its claims.  The Trustee has not even directly addressed the detailed evidence on the value of the Collateral presented by Defendants.  The Trustee has failed to raise a single viable question of fact or law in its challenge to the Second Motion.   Therefore, Defendants respectfully request that the Court grant them summary judgment on all counts of the Complaint, deny the Trustee's request for partial summary judgment and grant Defendants such other and further relief as the Court deems just and appropriate.

Dated:  November 19, 2010

**LANDIS RATH & COBB LLP**

/s/ Rebecca L. Butcher
Richard S. Cobb (No. 3407)
Rebecca L. Butcher (No. 3816)
919 Market Street, Suite 1800
P.O. Box 2087
Wilmington, Delaware  19899
Telephone: (302) 467-4400
Facsimile:  (302) 467-4450

Counsel for Connecticut Community Bank,
N.A d/b/a Greenwich Bank & Trust
Company and James J. Fuld, Jr.